Docket No. 101418.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

ANTHONY MARCONI, Appellee, v. THE CHICAGO HEIGHTS
POLICE PENSION BOARD *et al.*, Appellants.

*Opinion filed October 19, 2006.–Modified on denial of rehearing
May 29, 2007.*

PER CURIAM
Justice Fitzgerald dissented, with opinion.
Justices Kilbride and Burke took no part in the decision.

## OPINION

Plaintiff, Anthony Marconi, filed an application for a disability
pension with defendant Chicago Heights Police Pension Board
(Board). During the pendency of the Board's review of plaintiff's
application for a disability pension, plaintiff filed suit in the circuit
court of Cook County, requesting, *inter alia*, a declaratory judgment
that the Board did not timely complete review of his application.
While the declaratory action was pending in the circuit court, the
Board issued a decision denying plaintiff a disability pension.
Plaintiff thereafter filed an action for administrative review in the
circuit court of Cook County. The circuit court ultimately confirmed
the Board's decision on administrative review. Soon thereafter, the
circuit court granted the Board summary judgment in the declaratory

action. On appeal, the appellate court affirmed the grant of summary judgment in the declaratory action, reversed the circuit court's affirmance of the Board's decision to deny plaintiff a disability pension, and remanded this cause to the Board for further proceedings. 361 Ill. App. 3d 1. In addition, the appellate court also declared section 3–115 of the Illinois Pension Code (40 ILCS 5/3–115 (West 2002)) unconstitutional as applied to plaintiff.

On appeal to this court, the Board challenges only the appellate court's reversal of the Board's denial of plaintiff's disability pension claim on administrative review, and the appellate court's holding that section 3–115 of the Pension Code (40 ILCS 5/3–115 (West 2002)) is unconstitutional as applied. For the reasons that follow, we reverse the judgment of the appellate court with respect to plaintiff's administrative review action, and vacate that portion of the appellate court's opinion holding section 3–115 of the Pension Code unconstitutional as applied to plaintiff.

BACKGROUND

Plaintiff became a sworn member of the Chicago Heights police department (Department) on October 10, 1988, holding the rank of patrol officer. On February 8, 1996, plaintiff was sent by the Department to Dr. Carl Wahlstrom, the Department's own psychiatrist, to determine his fitness for duty. The Department referred plaintiff to Dr. Wahlstrom after plaintiff's colleagues had reported to the Department's then-chief of police, Carla Osantowski, that plaintiff had threatened to commit suicide. During plaintiff's session with Dr. Wahlstrom, plaintiff admitted that he had experienced thoughts of committing suicide and had expressed those thoughts to fellow officers. However, plaintiff told Dr. Wahlstrom that, at the time of the evaluation, he no longer felt suicidal. Dr. Wahlstrom concluded that plaintiff was fit to return to duty.

Plaintiff was again sent by Chief Osantowski to Dr. Wahlstrom for a fitness evaluation on July 24, 1996. Chief Osantowski questioned plaintiff's fitness for duty based upon incidents where plaintiff had exhibited hostility towards others. As part of the evaluation, Dr. Wahlstrom met with plaintiff for several sessions, and spoke with Chief Osantowski as well as plaintiff's longtime

girlfriend, Sheila. Dr. Wahlstrom concluded that plaintiff was suffering from major depression and stress related to work and outside factors. Dr. Wahlstrom noted that these stressors included several on-the-job shooting incidents and an FBI investigation of the Department. Although Dr. Wahlstrom opined that plaintiff was fit to resume duty, this recommendation was contingent on plaintiff continuing in psychotherapy and taking prescribed psychotropic medications. Accordingly, the Department arranged for plaintiff to attend biweekly psychotherapy sessions with Dr. Wahlstrom. Plaintiff also began taking three prescription medications: trazodone, an antidepressant; Depakote, a mood-stabilizing medication; and clozapine, an antianxiety medication.

On September 9, 1996, Dr. Wahlstrom faxed a letter to Chief Osantowski informing her that plaintiff had made direct physical threats of bodily harm against her, including a statement that plaintiff wanted to "knock[ ] her out." Dr. Wahlstrom also warned Chief Osantowski that plaintiff was unable to exercise reasonable judgment where she was concerned, and that plaintiff stated he was "85% certain" that he would harm her "if he got within arms length of her." Dr. Wahlstrom diagnosed plaintiff with "major depression along with stress, related both to work and his outside life circumstances," and wrote that plaintiff's "perceptions relating to his work environment [were] deteriorating and unstable." Dr. Wahlstrom found plaintiff to be "disabled by this condition" and, accordingly, declared plaintiff to be unfit for duty. Dr. Wahlstrom further stated that he was "unable to determine the recovery period for [plaintiff's] condition at this time." Based upon Dr. Wahlstrom's report, Chief Osantowski ordered plaintiff to surrender his credentials. Plaintiff complied, and, at that time, he ceased to be on active duty status. For the next year, plaintiff was placed on disability leave and continued to receive his pay.

On April 22, 1997, plaintiff filed with the Board an application for duty-related disability pension benefits. In correspondence dated April 30, 1997, the Board acknowledged plaintiff's application and requested that plaintiff provide the Board with certain information, including medical documentation and a statement of plaintiff's injury. In addition, the letter stated that the Board would require plaintiff to be examined by three physicians selected by the Board in accordance with section 3–115 of the Pension Code (40 ILCS 5/3–115 (West

-3-

2002)), and that plaintiff would be notified by separate letter of the date, time and location of the examinations. The Board's letter further stated that "[o]nce these examinations are complete and the medical reports and Physician's Certificate of Disability are received, the Pension Board will schedule this matter for a hearing."

In a letter dated September 24, 1997, plaintiff's counsel responded that he had contacted plaintiff's treating psychiatrist, Dr. Wahlstrom, concerning the cause of plaintiff's disability. In addition, plaintiff's counsel wrote that it was his own "understanding" that "the multiple shootings [plaintiff] was involved in while on the job greatly contributed to his disability." Plaintiff's counsel also requested that "a hearing be held as soon as possible." On October 1, 1997, the Board's counsel wrote a letter to plaintiff's counsel, enclosed copies of plaintiff's personnel records, and stated that the Board could now schedule plaintiff to be examined by three physicians selected by the Board. However, counsel for the Board also stated that the personnel records did not show any shootings in which plaintiff was allegedly involved. Counsel for the Board therefore requested plaintiff's counsel to forward copies of any documentation regarding plaintiff's involvement with any shootings, as the Board's physicians would "undoubtedly want to review those documents as well." The Board's counsel concluded the correspondence by writing that "no hearing can be held until such time as the Pension Board is in receipt of the reports from its three psychiatrists."

Plaintiff provided the Board with all requested information by November 12, 1997. The Board then scheduled plaintiff to be examined by three psychiatrists and one psychologist, all selected by the Board in accordance with section 3–115 of the Pension Code. Plaintiff's psychiatric and psychological evaluations were conducted on June 30, 1998, July 6, 1998, July 7, 1998, November 20, 1998, and December 10, 1998.

On September 2, 1999, the Board held its first hearing on plaintiff's application. During this proceeding, plaintiff amended his disability application to alternatively request a non-duty-related disability pension in the event that the Board denied his request for a disability pension that was duty-related. In addition, during this proceeding the Board admitted various exhibits into evidence, including plaintiff's personnel records and the reports of the three

psychiatrists and one psychologist selected by the Board to evaluate plaintiff's condition. Three of these four medical reports concluded that plaintiff was disabled. We briefly overview each of these reports *seriatim.*

Dr. Harley G. Rubens filed a physician's certificate dated June 30, 1998, stating that he had examined plaintiff and certified plaintiff to be disabled for service within the Department. This certificate accompanied a psychiatric evaluation report from Dr. Rubens, dated July 7, 1998. In the report, Dr. Rubens stated that he based his opinion upon a 1½ hour interview with plaintiff conducted on June 30, 1998, as well as upon the following additional information: a review of correspondence from Dr. Wahlstrom and Dr. Wahlstrom's progress notes; pertinent police reports from the Department; a list of incidents involving plaintiff; and correspondence from plaintiff's attorney.

According to Dr. Rubens' report, plaintiff stated that he was removed from active duty and referred to Dr. Wahlstrom for evaluation because the Department thought plaintiff "was a loaded gun." Plaintiff stated that during his nine years of active duty with the Department, he was shot at four times. In his report, Dr. Rubens provided details with respect to two of these incidents. Plaintiff described the initial shooting incident to Dr. Rubens as a situation in which another officer shot at a suspect who was escaping, and that at the time the shot was fired the suspect had been standing between that officer and plaintiff. Plaintiff stated that if the officer had missed the suspect, plaintiff would have been shot. When plaintiff told his supervisors about this incident, plaintiff stated that they responded that he would "get used to getting shot at." According to Dr. Rubens, plaintiff expressed disillusion with the Department, not only because he felt a lack of support, but also because the Department had recently undergone a corruption investigation by the FBI, and plaintiff noted that many of his former supervisors were currently in jail. Plaintiff stated that he became very depressed in 1994 when FBI agents placed him under surveillance as part of their investigation of the Department. According to plaintiff, when the FBI was unable to find that he had done anything wrong, the IRS then audited his tax returns.

Dr. Rubens also noted in his report that during the interview plaintiff expressed a deep hatred for African-Americans, whom he

-5-

referred to throughout the session by using a derogatory racist slur. In his report, Dr. Rubens described a second shooting incident involving plaintiff wherein plaintiff engaged in a chase of a stolen car and the suspects started shooting at him. According to plaintiff, his partner, an older African-American man, slept through the entire incident, and plaintiff greatly resented it. Plaintiff told Dr. Rubens that he was last shot at by a "gang member," and that he had called dispatch for help but that the paramedics arrived at the scene before his backup did. Plaintiff told Dr. Rubens that "[w]hat goes on at the job now is different. It used to be I cared about people–now if a[n] [African-American] is laying on the street I'd just drive by." Plaintiff related to Dr. Rubens that he had nightmares several times a month about his being shot at by "gang bangers" and would awaken from these dreams drenched in sweat.

According to Dr. Rubens, plaintiff exhibited traits of paranoia where African-Americans were concerned. Dr. Rubens stated that this was exemplified by plaintiff's statement that "my biggest fear is that I might shoot somebody who didn't do anything if I went back to work as a police officer." Plaintiff also stated to Dr. Rubens that "[i]f I go back now I'll shoot the [African-Americans]. I used to bust my tail to make peace with the gangs and everyone else but no more." Plaintiff also told Dr. Rubens, "I would like to be a cop but I know that I can't." Yet, Dr. Rubens also reported that plaintiff told him that although plaintiff did not work the first year after he was removed from full duty and placed on temporary disability, plaintiff "felt that he could have worked."

Dr. Rubens also found it notable that plaintiff's judgment "seemed intact except in his dramatic descriptions of how he would shoot a[n] [African-American] if he had a gun and was on duty and saw one." In Dr. Rubens' view, plaintiff's statements "seemed to be somewhat dramatized and its doubtful that he would, in fact, do so but it is possible." Dr. Rubens also wrote in his report that he found it "interesting" that plaintiff carried a gun to the interview, "despite the fears of what he might do."

In addition, Dr. Rubens also noted that, at the time of the interview, plaintiff was "pleased and satisfied" with his relationship with his girlfriend, Sheila, and her children. According to Dr. Rubens, plaintiff described to him "feeling uplifted and excited every day

-6-

when he wakes up," and Dr. Rubens concluded that it was therefore "unlikely that there is any form of psychiatric care treatment that would enable [plaintiff] or motivate him to return to full-unrestricted police duties, where he might risk his life."

Based upon his interview of plaintiff and review of other pertinent information, Dr. Rubens diagnosed plaintiff as suffering from the following psychological disorders: "1. Major depression by history, resolved. 2. Acute stress disorder in the past, resolved. 3. Adjustment disorder with mixed anxiety and depression. 4. Personality disorder NOS." In support of his diagnosis, Dr. Rubens wrote in his report that "plaintiff underwent traumatic situations while working in the Chicago Heights Police Department," and that plaintiff was also angered by the fact that nobody listened to him and provided backup support for him. Dr. Rubens noted that plaintiff "has a history of acting impulsively and later regretting it," and "if he were to return to police work, [plaintiff] might do something foolish to prove the point that he is too infirm and too damaged to be a police officer." Accordingly, Dr. Rubens found plaintiff to be disabled for police work as a result of a psychological disability.

The second psychiatrist requested by the Board to examine plaintiff was Dr. Henry Conroe. Dr. Conroe filed a physician's certificate dated September 29, 1998, stating that he had examined plaintiff and certified plaintiff to be disabled for service within the Department. This certificate accompanied a psychiatric evaluation report from Dr. Conroe dated September 28, 1998. Dr. Conroe wrote that he based his opinions upon a two-hour examination of plaintiff on July 6, 1998, and also upon the following evidence: correspondence from plaintiff's attorney and Dr. Wahlstrom; a phone conversation with Dr. Wahlstrom; plaintiff's personnel and medical records; and police reports of the shooting incidents.

At the time of the interview, plaintiff was working part-time as a "car jockey" at an automobile dealership. Dr. Conroe found plaintiff's mood to be predominantly angry, much of it directed towards African-Americans, to whom plaintiff referred to throughout the interview by using a derogatory racist slur. However, according to Dr. Conroe, plaintiff exhibited "little anxiety or sadness" during the interview.

Plaintiff stated to Dr. Conroe that his work-related problems started at the time of the first shooting incident. Plaintiff then described to Dr. Conroe four shooting incidents in which plaintiff was involved. According to Dr. Conroe's report, plaintiff described the events occurring during the first two incidents just as they were related by Dr. Rubens in his report: when a fellow officer shot at an offender who was positioned between the other officer and plaintiff; and when plaintiff pursed a stolen auto and the offenders began shooting at him while his partner remained asleep. Dr. Conroe provided additional details in his report with respect to the other two shooting incidents involving plaintiff. Plaintiff stated that one incident occurred when suspects were shooting at cars driving toward plaintiff, and the windows of the other cars were shot out. According to plaintiff, the other incident occurred in approximately July 1996, when plaintiff observed two gangs shooting at each other, during which a male positioned near plaintiff was wounded by gunfire. During this incident, plaintiff called for backup, but the paramedics arrived before his fellow officers did. Plaintiff stated to Dr. Conroe that after the last shooting incident he told his superiors that he no longer wanted to be shot at. According to plaintiff, soon thereafter the Department referred him to see Dr. Wahlstrom for a fitness evaluation.

Dr. Conroe further noted in his report that plaintiff stated that he had previously been sent by the Department to Dr. Wahlstrom for a fitness examination because plaintiff had made comments to his colleagues about committing suicide. Plaintiff explained that he made these comments because he had problems at home and was also being followed by the FBI as part of its corruption investigation of the Department. However, by the time of the interview with Dr. Conroe, plaintiff stated that he no longer had ideations of suicide. Dr. Conroe noted that, nevertheless, plaintiff remained disillusioned with the Department and harbored resentment that although he had been honest, he had been treated during the FBI investigation as being dishonest.

At the time Dr. Conroe interviewed plaintiff, plaintiff stated that he often experienced dreams of being shot at, and that he would awaken from these dreams soaked in sweat. Plaintiff also had gained 60 pounds. Because of his employment situation, plaintiff was forced

to sell his belongings and give up his hobbies. Dr. Conroe noted that plaintiff was still authorized to carry a weapon and he brought it to the interview. Plaintiff stated to Dr. Conroe that he carried the gun everywhere and trusted no one. According to plaintiff, being shot at changed his mind about African-Americans, causing him to have great animosity against them. Plaintiff stated that he loves his work and would love to return to the force, but his hatred of African-Americans prevented him from doing so.

Dr. Conroe also asked plaintiff about his difficulties with Chief Osantowski. Plaintiff responded that he had problems with the police chief because the chief and his girlfriend did not get along. Plaintiff believed that his work life and personal life should be kept separate, and it angered him that the chief discussed his home life at work. However, at the time of the interview, Dr. Conroe wrote that plaintiff "praised" Chief Osantowski and stated that "he felt that she is doing a fine job."

Based upon his interview with plaintiff and other relevant information, Dr. Conroe diagnosed plaintiff as suffering from a "Major Depressive Episode in Partial Remission," and found that plaintiff was therefore disabled for full unrestricted duties in the Department. Dr. Conroe explained that, in his view, plaintiff lacked the ability to interact safely with the public and plaintiff's capacity to respond appropriately to the demands of his job would be severely impaired. Dr. Conroe was of the opinion that plaintiff's disability was "to a large degree caused by the unique job duties of a police officer not shared by an ordinary citizen," and that the "major stressors were his disillusionment relating to the investigation of prominent Chicago Heights officials and their convictions for corruption and the shooting incidents while on duty."

The third medical professional who evaluated plaintiff at the request of the Board and found plaintiff to be disabled was Dr. Ronald Ganellen, a neuropsychologist. Dr. Ganellen submitted a psychological evaluation dated December 10, 1998, in which he opined that plaintiff was disabled for service in the Department. Dr. Ganellen, however, did not initially file a certificate of disability with his report. As will be discussed later in this opinion, Dr. Ganellen filed a certificate in February 2004, stating that plaintiff was disabled for service in the Department.

Dr. Ganellen conducted a psychological evaluation of plaintiff on December 10, 1998. In addition to interviewing plaintiff, Dr. Ganellen also administered several psychological tests to plaintiff and reviewed Dr. Wahlstrom's notes. Dr. Ganellen began his report by observing that the Department had placed plaintiff on a leave of absence in September 1996, because of his emotional condition, and that plaintiff claimed that he had been unable to handle the responsibilities of his job in a safe manner as the result of work-related stress.

Plaintiff stated to Dr. Ganellen that, earlier in his career, plaintiff had been given a number of plaques and awards for his job performance. However, plaintiff began to experience considerable job-related stress as a result of the FBI investigation of the Department and his being placed under surveillance. In addition, plaintiff also informed Dr. Ganellen that he had encountered undercover FBI agents while on patrol. Plaintiff further stated to Dr. Ganelllen that he changed over time in that he developed a temper and became intolerant of African-Americans, referring to them by a derogatory racist slur. According to plaintiff, his attitudes changed as a result of the crime scenes he observed and the four shooting incidents in which he was involved. These were the same shooting incidents described in the reports submitted by Dr. Rubens and Dr. Conroe.

According to Dr. Ganellen, plaintiff was also upset about the way that he was treated by the Department. Plaintiff acknowledged that he had stated to a coworker that plaintiff wanted to "put a gun in [his] mouth and blow [his] brains out," but he then thought about the harm that would befall his family as a result of that action, and he knew he could not do it. Plaintiff also told Dr. Ganellen that he was "offended" when the Department instructed him to see Dr. Wahlstrom for a fitness evaluation as a result of his talk of suicide.

Dr. Ganellen also wrote in his report that plaintiff stated that he became embroiled in a conflict with Chief Osantowski when she made comments about plaintiff's relationship with his girlfriend. Although plaintiff told the chief to leave his personal business alone, she reportedly continued to make comments, and plaintiff had words with her. Thereafter, plaintiff stated that he was once again referred by the Department to Dr. Wahlstrom, and has not returned to work

ever since. Dr. Ganellen noted, however, that at the time of his interview with plaintiff, plaintiff expressed no anger against Chief Osantowski and held no grudges against her.

When Dr. Ganellen inquired of plaintiff whether he was ready to return to work as a police officer, plaintiff stated that he could not safely return to work because of his angry reactions to African-Americans and his tendency to act before thinking. Dr. Ganellen wrote that plaintiff "believes either he would kill someone if he perceived himself as being in danger, or that he might get killed if he hesitated." Dr. Ganellen noted that plaintiff carried a gun with him and that he slept with it by his side. Plaintiff stated to Dr. Ganellen that he experienced nightmares about the shooting incidents, and would wake up in a sweat.

However, when Dr. Ganellen asked plaintiff about his mood at the time of the interview, plaintiff responded that he was not depressed. Plaintiff was pleased that he had found employment, and Dr. Ganellen described plaintiff's level of energy, interest in activities and ability to enjoy himself as "normal." In addition, Dr. Ganellen noted that plaintiff had not had any difficulties with concentration and was not troubled by self-critical thoughts or guilt.

Upon completion of his evaluation, Dr. Ganellen diagnosed plaintiff with paranoid features and wrote that, in his opinion, plaintiff "is not able to return to work as a police officer at the present time as he may present a risk to public safety as well as to his own safety." Dr. Ganellen found that plaintiff's "psychological functioning revolves to a large extent around efforts to contain anger and resentment," and that plaintiff's anger "can cloud his judgment to such [an extent] that he may react to a situation in an unplanned, unpredictable manner to protect himself or to get back at the person he perceives hurt him without first thinking about the possible consequences of his actions."

An opposite conclusion with respect to plaintiff's disability was reached by the fourth doctor to which plaintiff was referred by the Board for evaluation, Dr. Richard Harris. Dr. Harris filed a physician's certificate dated December 11, 1998, stating that he had examined plaintiff and certified that plaintiff was not disabled for service within the Department. This certificate accompanied a

psychiatric evaluation authored by Dr. Harris, dated December 9, 1998.

Dr. Harris' evaluation was based upon two interviews he conducted with plaintiff on July 7, 1998, and November 20, 1998, for a period of nearly four hours. In addition to interviewing plaintiff, Dr. Harris also relied on Dr. Wahlstrom's notes and letters; phone conversations with Dr. Wahlstrom, Chief Osantowski, and plaintiff's longtime girlfriend, Sheila; police reports of the shooting incidents; and pertinent records from plaintiff's personnel files. Dr. Harris' 29-page written report was by far the longest of the four reports submitted to the Board.

Dr. Harris wrote that plaintiff began the first interview by stating that he wanted to return to work but that "they don't want me to return." Plaintiff told Dr. Harris that in February 1996, he was referred to Dr. Wahlstrom by Chief Osantowski because of a comment overheard by another officer that plaintiff thought that suicide was better than what he had been going through. After seeing Dr. Wahlstorm at that time, plaintiff was told that he did not need to return for therapy. Plaintiff stated that he was then referred to Dr. Wahlstrom a second time because of his hatred against African-Americans, and Dr. Harris observed that plaintiff referred to African-Americans throughout the interview by use of a derogatory racist slur. Plaintiff told Dr. Harris that he was eventually removed from active duty in September 1996 because "I guess they didn't like my attitude." Plaintiff also reported to Dr. Harris that he had been involved in several shooting incidents, and discussed with him the same four incidents detailed in the reports authored by Drs. Rubens, Conroe and Ganellen.

According to Dr. Harris, plaintiff stated that a conflict arose between him and Chief Osantowski because she accused plaintiff of not treating his girlfriend well. Plaintiff stated to Dr. Harris that Chief Osantowski called him once per week at home, and had told plaintiff–both privately and in public–that he did not love his girlfriend. Plaintiff believed that the chief was too involved in his personal life, and he resented this intrusion. However, at the time of his interview with Dr. Harris, plaintiff stated that he no longer had animosity toward the former chief, and, in fact, plaintiff believed that

"she had done good work" and that the Department "had benefitted from her approach to police administration."

Dr. Harris noted in his report that plaintiff "was consistently vague" about the reasons he was removed from active duty, and that plaintiff seemed "at a loss to explain why his doctor would not release him to return to work as a police officer." At one point, plaintiff told Dr. Harris that plaintiff was eventually removed from active duty because Dr. Wahlstrom considered him to be a "loaded gun." Plaintiff told Dr. Harris during the second interview that if he returned to active duty he would "hurt someone," and that he would pull his gun first and ask questions later. Plaintiff also stated to Dr. Harris that if he returned to the force he would beat up African-Americans if they gave him any trouble.

Dr. Harris further reported that plaintiff stated that although the three psychotropic medications prescribed by Dr. Wahlstrom worked to relax him, they took away neither his anger and hate against African-Americans nor his nightmares of the shootings. Plaintiff stated that in his nightmares he relived the shooting incidents and woke up in a sweat.

Dr. Harris also interviewed the Department's former chief of police, Carla Osantowski. She stated that in February 1996, a colleague of plaintiff's came to her office and informed her that plaintiff was depressed and was speaking of shooting himself. As a result, she referred plaintiff to Dr. Wahlstrom for a fitness evaluation. After Dr. Wahlstrom cleared plaintiff, he returned to work. However, Chief Osantowski again referred plaintiff to Dr. Wahlstrom in July 1996, because plaintiff appeared to be depressed. Sometime thereafter, Dr. Wahlstrom warned her that she may be in danger because plaintiff had very angry feelings toward her.

In addition, as part of the evaluation, Dr. Harris also interviewed Dr. Wahlstrom. According to Dr. Harris, Dr. Wahlstrom believed plaintiff "was having a growing disillusionment with police work and was 'burned out.' " Further, Dr. Harris reported that Dr. Wahlstrom stated that plaintiff "had improved enough to return to work," but that Dr. Wahlstrom did not believe plaintiff was capable of doing police work because of "burn out." According to Dr. Wahlstrom, plaintiff also had difficulty controlling his anger and expressed hatred of African-Americans. Dr. Harris found it notable that, according to Dr.

-13-

Wahlstrom, plaintiff's anger against African-Americans and his discussion of the shooting incidents came after plaintiff had been in treatment for nearly two years. Dr. Harris wrote that even Dr. Wahlstrom found this to be unusual and "bizarre," and that there was no clear explanation as to why plaintiff suddenly began to express this hatred.

According to Dr. Harris, Dr. Wahlstrom did not believe that plaintiff was capable of doing police work and told Dr. Harris that he removed plaintiff from active duty because he was concerned about plaintiff's potential for violence. Dr. Wahlstrom also told Dr. Harris that when he warned Chief Osantowski about plaintiff's threats, it was only the second time in Dr. Wahlstrom's career that he had to warn someone that she was in danger. Dr. Wahlstrom also told Dr. Harris that plaintiff had expressed anger on occasion during their sessions.

Dr. Harris also reported that he had a conversation with plaintiff's girlfriend, Sheila. Sheila stated that plaintiff and Chief Osantowski had a dispute over her. Sheila explained that plaintiff was angry with the chief for getting involved in his personal affairs and resented the chief for telling plaintiff that he did not love Sheila. According to Dr. Harris, Sheila first stated that she had "no idea" why plaintiff had not returned to work, but that it was possible that he did not go back because he might hurt someone. Sheila stated, however, that she was not aware of any instances in which plaintiff caused harm to another. Sheila recalled that plaintiff's personality and attitude began to change in 1992 or 1993, and stated that now plaintiff is not as patient as he once was and had started using a derogatory racist slur to refer to African-Americans. Sheila informed Dr. Harris that plaintiff's use of the epithet was "getting worse especially because the pension is pending," and she wondered if plaintiff's irritability increased because he was not working.

Based upon the information he gathered in the course of evaluating plaintiff, Dr. Harris wrote in his report that he found plaintiff's communication to be "confusing," in that "it was very difficult to get a clear picture of the nature of the problem." From Dr. Harris' perspective, the differences in plaintiff's demeanor in the two interviews were notable. Dr. Harris wrote that during his first interview with plaintiff, although plaintiff expressed animosity for

-14-

African-Americans, used racial slurs, and stated he had recurrent dreams of the shooting incidents, plaintiff was not able to clearly communicate the reasons he was taken off duty. In addition, plaintiff presented his story without much emotion.

In the second interview, however, Dr. Harris noted that plaintiff kept coming back to his hatred for African-Americans, "like a record that was stuck." Dr. Harris stated that plaintiff "kept, in a manner of speaking, coming at me with his hatred. He was unrelenting and it soon began to feel like an assault." Dr. Harris wrote that plaintiff's angry and aggressive behavior was in striking contrast to his manner during a number of phone conversations he had previously had with plaintiff about securing plaintiff's medical records and scheduling appointments. Dr. Harris stated that he told plaintiff "directly that I was having difficulty determining the truth of the matter in regards to his disability application," and that "I saw my job as a duty to protect the interest of the pension board/fund and those applicants deserving of a disability benefit." Dr. Harris wrote that this "frank communication" brought about a change in interaction between them, as plaintiff then "settled down," and there was no further talk of plaintiff's hatred of African-Americans. Plaintiff then became very emotional to the point of tears–an indication, in Dr. Harris' view, of "more genuine emotion."

According to Dr. Harris, part of the confusion he experienced in listening to plaintiff was due to "brief periods when his thinking was disorganized," and these periods occurred during plaintiff's "hatred-filled monologues" when plaintiff appeared "crazy" with rage. Dr. Harris stated, "At some point I began to believe that he was making a great effort to manipulate me, that is, my thinking about his disability application. He was going out of his way to demonstrate his impairment." Along these lines, Dr. Harris stated that he had reviewed the police records before the interview and told plaintiff that "the police reports did not corroborate his account of the shootings," as the reports demonstrated neither that plaintiff was shot at nor that he was in obvious danger. Dr. Harris wrote, however, that plaintiff "always had an explanation for the discrepancy," including that the Department instructed officers not to record in the police reports that shots were fired at them.

Dr. Harris also attributed his confusion in evaluating plaintiff to his belief that plaintiff's "story" did not fit together due to "the many inconsistencies" in plaintiff's account. Dr. Harris "question[ed] the overall credibility of [plaintiff's] account," and noted that a close examination of plaintiff's case revealed "inconsistencies, contradictory information, misrepresentation and information that just doesn't fit." Dr. Harris wrote that, if he were to take plaintiff's story at "face value," he could find that plaintiff would be eligible for a duty-related disability pension, as plaintiff exhibited "overwhelming aggressive feelings that he will not be able to control when performing the normal duties of a police officer," and this aggressiveness would be due to plaintiff having been shot at on numerous occasions and his experiences as a police officer working in a town with a significant African-American population.

However, Dr. Harris rejected such a conclusion, based upon his interview of plaintiff and the other information he gathered as part of the evaluation process. Dr. Harris wrote that plaintiff "may very well have reactions to various police experiences but there is no objective evidence demonstrating a reaction of such severity as to constitute a psychiatric disorder." Dr. Harris noted with particular interest that plaintiff's anger towards African-Americans, as well as his references to the shooting incidents, did not surface until almost two years after he began treatment with Dr. Wahlstrom. According to Dr. Harris, a review of Dr. Wahlstrom's treatment notes revealed that plaintiff's prior references to African-Americans and the shooting incidents was "scant" and became a central part of plaintiff's discussions only after plaintiff applied for a duty-related disability pension. Dr. Harris wrote that, in his view, plaintiff was "too actively trying to convince me and I felt manipulated," and opined that plaintiff was engaging in a "conscious attempt to depict himself as barely controlled and a threat to blacks."

Dr. Harris then developed his own theory of what happened to plaintiff. In Dr. Harris' view, when plaintiff was first referred to Dr. Wahlstrom in February 1996, he was voicing suicidal thoughts because plaintiff had personal problems and financial worries. When plaintiff was again referred to Dr. Wahlstrom in July 1996, it was because he had anger against the chief for intrusion into his personal life and blamed her for difficulties in the relationship with his

girlfriend. Plaintiff was not removed from the force until he made a threatening statement against Chief Osantowski in September 1996. According to Dr. Harris, this statement was precipitated by plaintiff's belief that the chief was the cause of his breakup with his girlfriend, Sheila. Dr. Harris found that plaintiff's relationship with Sheila was the "most emotionally significant aspect" of plaintiff's life and that it caused plaintiff "some degree of depression," although he believed that the depression was not "severe." Based upon the evidence he reviewed, Dr. Harris opined that plaintiff's anger at the time of his removal from the Department was focused solely against the chief and not related to any other aspects of police work. In fact, Dr. Harris noted that there were references in the record which show that during that time period plaintiff enjoyed police work.

In addition, Dr. Harris "question[ed] how dangerous [plaintiff] was" at the time of his removal from the force, especially in light of the fact that although Dr. Wahlstrom found that plaintiff could not return to active duty due to his potential for violence, the doctor "apparently did not seem too concerned about [plaintiff's] carrying a gun during the height of his purported dangerousness." Dr. Harris wrote that Dr. Wahlstrom's "tolerance and/or implicit approval" of plaintiff's carrying a gun indicated that plaintiff "was not suffering from a severe or even moderate psychiatric disturbance characterized in part by barely controlled aggressiveness." Dr. Harris stated that "further evidence for the absence of a specific psychiatric disturbance is that Dr. Wahlstrom had some question about the benefits of therapy." Dr. Harris opined that "little was accomplished" in plaintiff's therapy sessions with Dr. Wahlstrom because, in Dr. Harris' view, "there wasn't a specific problem to treat."

Accordingly, Dr. Harris wrote that he "questioned the severity of [plaintiff's] past reported psychiatric disorder" and, although plaintiff may have experienced "a clear psychiatric disturbance warranting time off from work," Dr. Harris noted that plaintiff had a full year of paid disability leave and opined that plaintiff had sufficient time to recover from the problems he suffered in July-September 1996. Dr. Harris further wrote that, in his opinion, any "psychiatric impairment" that resulted in plaintiff's taking medical leave from work ended well before the conclusion of plaintiff's period of temporary disability payments in October 1997. Dr. Harris also found it notable that

plaintiff no longer harbored anger or resentment towards Chief Osantowski.

Dr. Harris concluded his report by opining that although plaintiff may have been "burned out" in his job as a police officer, burnout is not a psychiatric disorder. Dr. Harris wrote that he did not believe that plaintiff was a violent and unstable person, and, according to Dr. Harris, there is no objective evidence that plaintiff suffers from a psychiatric impairment which renders him unable to function as a police officer. Dr. Harris concluded his report by diagnosing plaintiff as having a "Major Depressive Disorder, Single Episode, in remission."

After admitting these four reports and three certificates into evidence, the Board stated that its members would review these documents prior to the next hearing, which was scheduled for October 4, 1999. The Board then adjourned.

However, the Board's next hearing on plaintiff's application did not occur until June 11, 2001. At that time, counsel for the Board noted that "a lot of time has passed" since plaintiff's application for disability was previously considered by the Board, and indicated that the delay was connected to the appointment of new Board members. Counsel noted that because "two of the members are new and have absolutely no knowledge basically of what the claim is," the Board decided to hear only the direct testimony of plaintiff and to defer cross-examination of plaintiff to a later time.

Plaintiff testified that he was hired by the Department as a patrol officer in October 1988, and he was first sent by the Department to see Dr. Wahlstrom for a fitness evaluation in February 1996. At that time, two officers had informed Chief Osantowski that plaintiff had made statements that he was thinking of committing suicide. Plaintiff stated that after his evaluation with Dr. Wahlstrom, he was sent back to work without medication or therapy. Plaintiff testified, however, that he was referred back to Dr. Wahlstrom in July 1996 by the Department because it thought his work was declining and depression was setting in. At that point, Dr. Wahlstrom prescribed plaintiff three medications–trazodone, Depakote and clozapine–and returned plaintiff to duty on the condition that he took his medication and continued in biweekly psychotherapy with him.

-18-

Plaintiff testified, however, that soon thereafter he was removed from duty. Plaintiff stated that at that time he did not want to be around other people, he gained a great deal of weight, he gave up his hobbies, and he did not sleep at night. In addition, plaintiff stated that these feelings caused him to have difficulties in his longterm relationship with his girlfriend, Sheila, and they separated for two months.

According to plaintiff, when Chief Osantowski began inquiring into his personal life it made him angry. Plaintiff stated that he wanted the chief to mind her own business, and he believed that what went on after work was his business. Plaintiff testified that, at that time, he was "lashing out at everything and any authority figure that even tried to tell [him] anything." Plaintiff stated that he was aware that his feelings towards, and comments about, Chief Osantowski led to him being removed from the force, but that now he harbors no ill will or anger towards her.

Plaintiff also spoke of the FBI investigation of the Department and the negative effect that investigation had on him. Plaintiff stated that he was placed under surveillance and that FBI officers routinely sat in cars in front of his home. In addition, plaintiff stated that he encountered undercover FBI agents on three occasions while he was working. Plaintiff testified that this situation made him very uncomfortable, as he believed that he was always being watched. Subsequently, several officers that plaintiff worked with–and that he described as "good friends"–were indicted and sent to jail. Plaintiff stated that the FBI investigation and its outcome negatively affected the way that he viewed police work because he did not know whom to trust. Plaintiff also stated that it was his belief that the FBI investigation led the IRS to subsequently audit his tax returns.

Plaintiff then testified with respect to four on-the-job shooting incidents. These were the same shooting incidents described in the reports submitted by Drs. Rubens, Conroe, Ganellen and Harris. Plaintiff testified that these incidents bothered him a great deal and he told his supervisors that he was tired of being shot at, to which they responded that plaintiff could speak with a priest. Plaintiff testified that he refused to meet with the priest, and stated that he did not seek any other counseling. According to plaintiff, it was after the last

-19-

shooting incident in July 1996 that things became difficult with his girlfriend, and he began having recurrent dreams about the shootings.

Plaintiff testified that the shooting incidents came up in the course of his psychotherapy with Dr. Wahlstrom, but not in the beginning. Plaintiff stated that, at the start of therapy, the focus was more on his anger towards the chief and his difficulties with his girlfriend. However, as his therapy continued, plaintiff stated that the trauma he suffered in relation to the shootings began to surface. Plaintiff believed that he had made progress in psychotherapy. However, at the time of the hearing, plaintiff testified that he had not had sessions with Dr. Wahlstrom for the prior six months, as he could no longer afford to pay the costs. In addition, plaintiff stated that he was no longer taking the psychotropic medications that had been prescribed by Dr. Wahlstrom. Plaintiff further testified that at the time of the hearing he would characterize himself as "normal," and he stated that he was employed by a car dealership as the head valet and worked with African-Americans without incident.

The direct examination of plaintiff then concluded. During the June 11, 2001, proceeding, the Board also admitted into evidence the deposition testimony of Dr. Carl Wahlstrom, plaintiff's treating psychiatrist. Dr. Wahlstrom testified that the first time he saw plaintiff was on February 8, 1996, when plaintiff was referred to him by the Department for a fitness evaluation after he made comments that he wanted to commit suicide. Because plaintiff had no prior psychiatric treatment or hospitalizations, and because plaintiff stated that he was not prone to suicidal tendencies at that time, Dr. Wahlstrom allowed plaintiff to return to active duty.

Dr. Wahlstrom testified that plaintiff was again referred to him for a fitness examination in July 1996, and he saw plaintiff on several occasions. Dr. Wahlstrom stated that the police chief had referred plaintiff for evaluation because plaintiff had expressed hostility towards her. According to Dr. Wahlstrom, the examination disclosed that plaintiff was suffering from a major depression and an anxiety disorder not otherwise specified. Dr. Wahlstrom stated that plaintiff was experiencing stress caused by the FBI investigation, as well as the several shooting incidents in which he had been involved, and, as a result, plaintiff had lost a great deal of idealism about being a police officer. Although Dr. Wahlstrom did not find that plaintiff was

disabled by these conditions, Dr. Wahlstrom allowed plaintiff to return to duty only on the condition that plaintiff begin taking prescription psychotropic medications and attend biweekly psychotherapy sessions.

By September 1996, however, plaintiff's condition had deteriorated and, Dr. Wahlstrom testified, he contacted Chief Osantowski because plaintiff was making direct physical threats against her safety. It was only the second time in Dr. Wahlstrom's career that he had to deliver such a warning. Dr. Wahlstrom stated that plaintiff was very agitated and it was not the kind of situation where he could reason with plaintiff, even though plaintiff was under his care. Dr. Wahlstrom stated that plaintiff was angry, depressed and consumed with hatred against the chief because he believed that her interference in his personal life was causing the breakup of his relationship with his girlfriend, Sheila. Dr. Wahlstrom testified that plaintiff had become more unstable and that plaintiff's perceptions relating to his work environment were deteriorating. Upon plaintiff's suspension from the Department, he continued to undergo psychotherapy with Dr. Wahlstrom, who opined that plaintiff "is unable to return to work as a police officer, and that is secondary to the nature and extent of his mental condition and the fact that he himself, although wishing to return, does not feel that he can do so safely."

After hearing the direct testimony of plaintiff and admitting the deposition of Dr. Wahlstrom into evidence, the Board then moved to generally continue its review of plaintiff's application for disability pension and adjourned. No date was set by the Board for the next hearing.

The Board reconvened and conducted the next hearing on plaintiff's application for disability pension on August 26, 2002. On that date, the Board called several police officers to testify with respect to the shooting incidents related by plaintiff during his testimony and described in the reports of Drs. Rubens, Conroe, Ganellen and Harris. Detective Sergeant Bryan Howard, retired Officer Frank Cole, and Sergeant Michael Leuser offered testimony that in some respects corroborated plaintiff's version of the shooting events, but in other respects contradicted plaintiff's testimony. Plaintiff was then cross-examined by members of the Board, as well

as the Board's counsel. Plaintiff's testimony largely mirrored that offered during his direct examination. The Board then adjourned the hearing.

The Board's next hearing occurred on September 16, 2002. Plaintiff called Corporal Robert Price of the Park Forest police department to testify with respect to one of the shooting incidents. Price's testimony largely corroborated plaintiff's testimony. In addition, the Board also admitted into evidence several documents which referenced this particular shooting incident and which supported plaintiff's version of events. The Board then adjourned the hearing.

The Board next convened on October 23, 2002. During this proceeding, the Board issued its decision denying plaintiff's application for disability pension benefits. The Board began its written ruling by acknowledging that although plaintiff's application had been pending before the Board "for some time," the delay in hearing plaintiff's petition "was not the result of any animus of the Board for the applicant." Rather, the Board explained, the delay "resulted from a combination of unfortunate factors," including a "misunderstanding that the applicant had abandoned his application and the Board's inability to communicate promptly with its former attorneys."

The Board then turned to the merits of plaintiff's application. In its decision, the Board wrote that plaintiff's claim was complicated not only by the fact that the medical practitioners disagreed with respect to whether plaintiff suffered from a psychological disability under the Pension Code, "but also by conflicting testimony which casts doubt upon [plaintiff's] version of key disability-triggering events."

In discussing plaintiff's testimony, the Board found plaintiff to be a "complex" person. The Board noted that although it was undisputed that plaintiff had said inflammatory things in the past, this did not necessarily mean that plaintiff was unable to perform as a police officer. In addition, the Board noted that it was also uncontroverted that plaintiff refused to seek counseling after the shooting incidents, even though he stated that he was distressed by the events. In addition, it was evident that the anger plaintiff had previously held for Chief Osantowski had dissipated. Moreover, the Board noted that

plaintiff himself stated during his testimony that he was now "normal" and that he was no longer under psychiatric treatment or taking prescription psychotropic medications. The Board wrote that it found "this particular testimony compelling, in light of the fact that the most recent subjective appraisal of [plaintiff], by [plaintiff] himself, supports the finding that he is not disturbed."

The Board also noted in its decision that plaintiff's repeated use of a derogatory racist slur to refer to African-Americans during his interviews was "considerably troubling," especially as the city of Chicago Heights has a large African-American population. However, the Board was suspicious of plaintiff's use of this term, and explained its suspicions as follows:

> "The Board must consider why [plaintiff] would feel free to laden his psychological interviews with the constant use of that word. [Plaintiff] knew that he was being examined to determine if he suffered from a psychological disability. Given his self-interest in achieving a favorable report, it seems that plaintiff was using it to alarm the examining physicians into believing he suffered from a psychological impairment on the basis that only such a disabled person would use the word so often in a professional setting.
>
> *** [A]nother motivation could be to coerce this Board into granting a pension so that [plaintiff] would not be able to subject the City to possible liability, or subject this Board to the unfavorable publicity of 'putting a bigoted officer back on the street.' "

In addition, the Board found that plaintiff's testimony with respect to the shooting incidents was "inconsistent in several areas or rebutted by other witnesses." The Board contrasted plaintiff's testimony with that of Officers Howard, Cole and Leuser, and wrote that it "assign[ed] significant weight to the extent that th[e] testimony [of the other officers] refutes [plaintiff's] versions of the various events." The Board wrote that plaintiff's "credibility was put directly at issue by the testimony of other credible witnesses in this matter."

In its decision, the Board also closely examined the medical reports submitted by the four physicians, in addition to Dr. Wahlstrom's deposition testimony. The Board found that "of the four

medical reports, the report by Dr. Harris is the most lengthy and thorough evaluation of [plaintiff]," and, therefore, the Board determined Dr. Harris' opinion "to be the most credible and persuasive evaluation, and assigns it great weight." The Board favorably observed that Dr. Harris in his report had highlighted the contradictions in plaintiff's speech and behavior, and that Dr. Harris' "sincere assessment of [plaintiff's] inconsistent statements and demeanor *** was exceedingly persuasive." The Board agreed with Dr. Harris' opinion that plaintiff "manufactured a blend of behavior and statements in order to obtain a disability pension that he is not entitled to."

In conclusion, the Board wrote:

"At worst, [plaintiff] has concocted an aggressively bigoted persona and symptoms of a psychological disorder to convince doctors that he cannot perform the duties of a police officer. At best, it seems, [plaintiff] has some impediments, but medical practitioners simply cannot agree if they rise to the level necessary to qualify for a disability award under the Pension Code. In either case, awarding [plaintiff] a pension would violate this Board's fiduciary responsibility to the fund participants."

Therefore, the Board found that plaintiff had failed to establish by a preponderance of the evidence that he suffered from a disability within the meaning of the Pension Code which would entitle him to a disability pension.

On November 25, 2002, plaintiff filed in the circuit court of Cook County a complaint for administrative review of the Board's decision (administrative review action). Plaintiff alleged that his rights to due process had been violated as a result of the Board's excessive delays in hearing and ruling on his application for disability benefits. In addition, plaintiff alleged that the Board's decision to deny him disability pension benefits was erroneous because the decision of the Board was contrary to the majority of the opinions of the Board's own physicians finding him to be disabled and because the only medical opinion relied upon by the Board–that of Dr. Harris–was not competent due to the excessively long time it took for the doctor to examine plaintiff and render his opinion.

-24-

On January 26, 2004, the circuit court entered a written order denying plaintiff's petition for administrative review and confirming the decision of the Board denying plaintiff a disability pension. The circuit court held that although plaintiff was evaluated by more than three mental health professionals, he failed to submit three certificates of disability as required under section 3–115 of the Pension Code (40 ILCS 5/3–115 (West 2002)). Because the circuit court confirmed the Board's decision on the basis of statutory construction, the court declined to address plaintiff's additional due process argument.

Plaintiff thereafter filed with the circuit court a motion for reconsideration of its ruling in the administrative review action. The circuit court granted plaintiff's motion for reconsideration on February 5, 2004, and vacated its January 22, 2004, order. The circuit court remanded plaintiff's cause to the Board to allow plaintiff to obtain and present certificates of disability from Dr. Wahlstrom and Dr. Ganellen. On February 25, 2004, Dr. Wahlstrom filed a physician's certificate with the Board certifying that plaintiff is disabled for service in the police department. Dr. Ganellen filed a similar certificate with the Board on February 27, 2004.

On April 2, 2004, the Board reconvened to consider plaintiff's application in light of the two additional certificates of disability filed by Drs. Ganellen and Wahlstrom. The Board then issued an "Amended Decision," which again denied plaintiff's application for a disability pension. Counsel for the Board described the amended decision as "exactly the same decision as the Board rendered before with the exception that it references now we have the other certificate."

The matter then returned to the circuit court for administrative review of the Board's amended decision. On May 20, 2004, the circuit court issued a written memorandum and order confirming the Board's amended decision to deny plaintiff a disability pension. The circuit court agreed with the Board that there was competent evidence in the record–both medical and nonmedical–which supported the Board's decision. Accordingly, the circuit court held that the Board's decision was not against the manifest weight of the evidence.

With respect to plaintiff's due process claim, the circuit court noted in its written ruling that there were several delays in the hearing process and, despite the Board's contention to the contrary, no clear

explanation for the delays was provided in the original record. Nevertheless, the circuit court held that it was "not clear that the delays resulted in a deprivation of plaintiff's due process rights." The court concluded that plaintiff's hearing was still held at a meaningful time despite the delays, and that there was no indication that these delays impacted the Board's decision. Therefore, the circuit court held, the delays did not deprive plaintiff of due process.

Plaintiff appealed. The appellate court reversed the circuit court's ruling confirming the Board's decision to deny plaintiff a disability pension. The panel held that plaintiff was entitled to a disability pension retroactive to the time of his application, on the basis that "all of the mental health professionals, including Dr. Harris, agreed that at the time of his removal from active duty [plaintiff] was suffering from a psychiatric impairment that rendered him unable to function as a police officer." 361 Ill. App. 3d at 17-18. Accordingly, the appellate panel held that the Board erred in denying plaintiff a disability pension in light of what the panel characterized as the "unanimous" agreement of the medical evaluators that plaintiff was disabled. The appellate court remanded the cause to the Board, however, to determine whether plaintiff should receive a line-of-duty disability pension or a nonduty disability pension.

The appellate court also held, however, that section 3–115 of the Pension Code (40 ILCS 5/3–115 (West 2002)) is unconstitutional as applied where, as in plaintiff's case, one of the three doctors selected by the Board to evaluate the pension applicant does not certify the applicant's disability. Specifically, the appellate court found that plaintiff's right to due process was violated by the three-doctor certification requirement because it fails to provide the applicant with any right to question the Board's selection of doctors or to set aside unfavorable certificates. According to the appellate panel, where the Board's doctors do not unanimously certify the applicant disabled , as in the instant cause, whatever meritorious arguments the applicant may raise at a hearing have no bearing on the outcome of the case. In other words, the appellate court concluded that under this scheme the negative outcome of a hearing is predetermined, and, therefore, the applicant has no hearing at all.

We granted the Board's petition for leave to appeal. 210 Ill. 2d Rs. 315, 317. As stated, the Board appeals only from the appellate

court's ruling in the administrative review action, including the holding that section 3–115 of the Pension Code is unconstitutional as applied to plaintiff. We allowed the Illinois Municipal League leave to file an *amicus* brief in support of the Board. The Illinois Public Pension Advisory Committee was also allowed to file an *amicus* brief in support of plaintiff.

ANALYSIS

In administrative cases, our role is to review the decision of the administrative agency, not the determination of the circuit court. *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 560 (2004); *Board of Education of Round Lake Area Schools v. State Board of Education*, 292 Ill. App. 3d 101, 109 (1997). Under the facts presented in the instant cause, therefore, our review is focused solely upon the decision of the Board. Section 3–148 of the Pension Code (40 ILCS 5/3–148 (West 2002)) provides that judicial review of the decision of the Board is governed by the Administrative Review Law (735 ILCS 5/3–101 *et seq.* (West 2002)). See also *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001); *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 537 (1997). The Administrative Review Law provides that our review extends to all questions of fact and law presented by the entire record. 735 ILCS 5/3–110 (West 2002); *International Union of Operating Engineers, Local 148 v. Illinois Department of Employment Security*, 215 Ill. 2d 37, 61 (2005). The statute, however, specifically limits judicial review to the administrative record, and, therefore, we may not hear new or additional evidence in support of, or in opposition to, the decision of the administrative agency. 735 ILCS 5/3–110 (West 2002); *Robbins*, 177 Ill. 2d at 538.

The applicable standard of review–which determines the extent of deference afforded to the administrative agency's decision–depends upon whether the question presented is a question of fact, a question of law, or a mixed question of law and fact. *AFM Messenger*, 198 Ill. 2d at 390; *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204-05 (1998). Rulings on questions of fact will be reversed only if against the manifest weight of the evidence. *Comprehensive Community Solutions, Inc. v. Rockford*

*School District No. 205*, 216 Ill. 2d 455, 471-72 (2005). In contrast, questions of law are reviewed *de novo* (*Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995)), and a mixed question of law and fact is reviewed under the clearly erroneous standard (*AFM Messenger*, 198 Ill. 2d at 391-95; *City of Belvidere*, 181 Ill. 2d at 205). We further note that, under any standard of review, a plaintiff to an administrative proceeding bears the burden of proof, and relief will be denied if he or she fails to sustain that burden. See *Miller v. Fulton County Zoning Board of Appeal*s, 337 Ill. App. 3d 210, 216 (2003); *Iwanski v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 184 (1992).

In the instant appeal, the Board contends that the appellate court erred in setting aside the Board's decision denying plaintiff a disability pension. According to the Board, plaintiff failed to meet his burden of proof by presenting insufficient evidence to support his claim that he is eligible for a disability pension. The Board first notes that plaintiff proffered little evidence to support his claim for disability apart from his own testimony, and that plaintiff's testimony was inconsistent and also contradicted by three witnesses with respect to events plaintiff claimed were significant work-related stressors. In addition, the Board further observes that, by plaintiff's own testimony at the hearings, plaintiff stated that he was "normal," and informed the Board that he was not currently receiving psychiatric treatment or taking any prescription psychotropic medications. Finally, the Board notes that there were numerous inconsistencies in the medical testimony, and maintains, in its role as finder of fact, that it properly assigned greater weight to Dr. Harris' evaluation of plaintiff, as it determined Dr. Harris' report to be the most complete, thorough and persuasive of the four medical evaluations.

In response, plaintiff contends that the appellate court correctly set aside the decision of the Board and its judgment should be upheld. According to plaintiff, the appellate court correctly interpreted Dr. Harris' report to contain the opinion that plaintiff suffered from a psychiatric impairment at the time he was removed by the Department from active service, and that this creates the inference that had Dr. Harris examined plaintiff closer to the time plaintiff was removed from active service, he would have certified that plaintiff was disabled. Plaintiff therefore contends that the appellate court

correctly found that there were "unanimous" medical opinions that plaintiff suffered from a disabling psychiatric impairment at the time of his removal from active duty that rendered him unable to function as a police officer. Accordingly, plaintiff asserts, the appellate court correctly set aside the decision of the Board denying plaintiff a disability pension. We disagree.

The instant appeal presents the question of whether the evidence of record supports the Board's denial of plaintiff's application for a disability pension. This is a question of fact. The principles which guide our review of this matter are well settled. The Administrative Review Law provides that the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3–110 (West 2002); *Robbins*, 177 Ill. 2d at 538. As stated, therefore, rulings on questions of fact will be reversed only if against the manifest weight of the evidence. *International Union of Operating Engineers, Local 148*, 215 Ill. 2d at 61. "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Therefore, the "mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings." *Abrahamson*, 153 Ill. 2d at 88. We are also mindful that, "[i]n examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of an administrative agency." *City of Belvidere*, 181 Ill. 2d at 204. If the record contains evidence to support the agency's decision, that decision should be affirmed. *Commonwealth Edison Co. v. Property Tax Appeal Board*, 102 Ill. 2d 443, 467 (1984).

In the matter before us, plaintiff applied to the Board for consideration of an award of either a line-of-duty or nonduty disability pension. Section 3–114.1 of the Pension Code provides for a line-of-duty disability pension as follows:

>"Disability pension–Line of duty.
>
> (a) If a police officer as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his

or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension equal to the greatest of (1) 65% of the salary attached to the rank on the police force held by the officer at the date of suspension of duty or retirement, (2) the retirement pension that the police officer would be eligible to receive if he or she retired (but not including any automatic annual increase in that retirement pension), or (3) the pension provided under subsection (d), if applicable.

A police officer shall be considered 'on duty' while on any assignment approved by the chief of the police department of the municipality he or she serves, whether the assignment is within or outside the municipality." 40 ILCS 5/3–114.1(a) (West 2002).

In contrast, section 3–114.2 of the Pension Code provides for a nonduty pension as follows:

"Disability pension–Not on duty. A police officer who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service in the police department, shall be entitled to a disability pension of 50% of the salary attached to the officer's rank on the police force at the date of suspension of duty or retirement." 40 ILCS 5/3–114.2 (West 2002).

Finally, section 3–115 of the Pension Code provides that in considering an application for either a line-of-duty or nonduty disability pension, certain procedures must be followed by a pension board. Section 3–115 provides in relevant part:

"A disability pension shall not be paid unless there is filed with the board certificates of the police officer's disability, subscribed and sworn to by the police officer if not under legal disability, or by a representative if the officer is under legal disability, and by the police surgeon (if there be one) and 3 practicing physicians selected by the board. The board may require other evidence of disability." 40 ILCS 5/3–115 (West 2002).

-30-

As the applicant for disability pension benefits, plaintiff had the burden of proof to establish his entitlement to either a duty-related or nonduty disability pension. After carefully considering the entire record, we hold that the Board's conclusion that plaintiff failed to satisfy his burden of proof in establishing his eligibility for a disability pension is not against the manifest weight of the evidence. We therefore disagree with the appellate court's reversal of the Board's decision.

Central to the appellate court's reversal of the Board's ruling is the appellate panel's interpretation of Dr. Harris' report. According to the panel, "all of the mental health professionals, including Dr. Harris, agreed that at the time of his removal from active duty [plaintiff] was suffering from a psychiatric impairment that rendered him unable to function as a police officer." 361 Ill. App. 3d at 17-18. We disagree not only with the appellate court's reading of Dr. Harris' report, but also with the conclusions drawn by the panel from its interpretation of that report.

A fair and accurate reading of Dr. Harris' 29-page report reveals that Dr. Harris had serious questions with respect to whether, and if so, to what extent, plaintiff experienced psychiatric disturbances or disorders at the time of his removal from active duty in September, 1996. For example, Dr. Harris writes in his report that he not only "question[ed] the severity of the past reported psychiatric disorder," but also "question[ed] how dangerous [plaintiff] was" at the time of his removal from the Department, especially in light of the fact that although Dr. Wahlstrom found that plaintiff could not return to active duty due to his potential for violence, the doctor "apparently did not seem too concerned about [plaintiff] carrying a gun during the height of his purported dangerousness." Dr. Harris further wrote in his report that, in his view, Dr. Wahlstrom's "tolerance and/or implicit approval" of plaintiff's carrying a gun indicated that plaintiff "was not suffering from a severe or even moderate psychiatric disturbance characterized in part by barely controlled aggressiveness." The overall tenor of Dr. Harris' lengthy report is that, even at the time plaintiff was removed from duty, it is unlikely that he suffered from a psychiatric disturbance of such severity that it prevented plaintiff from functioning as a police officer. This reading of Dr. Harris' report is confirmed by Dr. Harris' statement that "further evidence for the

*absence of a specific psychiatric disturbance* is that Dr. Wahlstrom had some question about the benefits of therapy." (Emphasis added.) Indeed, Dr. Harris opined in his report that he believed that "little was accomplished" in plaintiff's therapy sessions with Dr. Wahlstrom because, in Dr. Harris' view, "there wasn't a specific problem to treat."

It is with these statements made by Dr. Harris in mind that we turn to the appellate court opinion below. In its opinion, the appellate panel refers to a passage from Dr. Harris' report, and relies upon this sole statement to support its finding that "all" of the mental health professionals who evaluated plaintiff "agreed" that he was disabled by a psychiatric impairment at the time of his removal from the Department in September 1996. In this passage, Dr. Harris writes:

> "Given that [plaintiff] had a clear psychiatric disturbance warranting time off from work, he had a full year of paid [temporary] disability. This time off resulted in the reduction of his angry feelings toward the chief. It was the threat to the chief that prompted the medical leave from work. He has had sufficient time to recover from the acute problems he experienced in July-September 1996. He is no longer suffering from a psychiatric disability."

We find that the appellate court overstated the significance of this passage from Dr. Harris' report. First, this statement must be placed in the proper positional context within Dr. Harris' report. This passage immediately follows Dr. Harris' statement opining that not only is there "no evidence that [plaintiff] is suffering from a psychiatric disorder," but also Dr. Harris' "question[ing] [of] the severity of the past reported psychiatric disorder." Second, this statement must also be viewed in light of the broader context of Dr. Harris' entire 29-page report, which contains numerous references to his questions about plaintiff's past and present mental state. In addition, the above-excerpted passage refers to Dr. Harris' review and discussion of plaintiff's treatment with Dr. Wahlstrom, and it would indeed be a strained reading of this passage to conclude that Dr. Harris was making a specific finding or giving his opinion that plaintiff actually suffered from a psychiatric disturbance which prevented him from serving as a police officer. Because Dr. Harris' report is replete with expressions of doubt with respect to whether

plaintiff suffered from a psychological or psychiatric disturbance–let alone whether plaintiff was disabled–it was improper for the appellate court below to ignore the factual dispute in the medical reports and hold instead, based upon this isolated passage in Dr. Harris' report, that all doctors who examined plaintiff were of the unanimous opinion that plaintiff suffered from a disabling psychiatric impairment at the time he was removed from active service.

The dissenting justice in this matter, however, agrees with the interpretation of Dr. Harris' report made by the appellate panel below, and asserts that we have proceeded on "the faulty premise that the appellate court misread the record in this case." Slip op. at 40 (Fitzgerald, J., dissenting). As an initial matter, we note that the dissent's opinion suffers from the identical infirmities as does the appellate court's decision below: it selects certain phrases from Dr. Harris' 29-page report, isolates them from the rest of the report, and uses these isolated phrases to support its preferred interpretation of Dr. Harris' conclusions. As set forth in detail above, Dr. Harris' report contains numerous expressions of doubt with respect to plaintiff's mental state from the time plaintiff first visited Dr. Wahlstrom to the time that plaintiff engaged in interviews with Dr. Harris. For example, as noted above, Dr. Harris stated that, at the time plaintiff underwent therapy with Dr. Wahlstrom–which includes the time during which plaintiff was removed from active duty–"further evidence for the *absence of a specific psychiatric disturbance* is that Dr. Wahlstrom had some question about the benefits of therapy." (Emphasis added.) In explanation, Dr. Harris wrote that "little was accomplished" in plaintiff's therapy sessions with Dr. Wahlstrom because, in Dr. Harris' view, "there wasn't a specific problem to treat." The dissent ignores these–and all other–statements made by Dr. Harris which refute its strained interpretation of his report, and fails to address the remainder of Dr. Harris' almost 30-page report–which we have painstakingly reviewed and excerpted in great detail above–that undermines the dissent's preferred reading.

More fundamentally, we observe that the dissent has lost sight of the fact that, in this action for administrative review, it is the decision of the *administrative agency*–here, the *Board*–that is under review, *not* the determination of the appellate court. See *Anderson*, 348 Ill. App. 3d at 560; *Board of Education of Round Lake Area Schools*, 292

Ill. App. 3d at 109. The dissent appears to be confused with respect to which decision is before us for review. The dissenting justice's entire three-paragraph analysis of Dr. Harris's 29-page report is misfocused upon his belief that the *appellate court's* interpretation of Dr. Harris' report is correct. Again, we emphasize that our role in this administrative review action is to determine whether the evidence of record supports the *Board's* denial of plaintiff's application for a disability benefit, that this inquiry is a question of fact, and that the *Board's* determination on this issue may only be reversed if we determine that it is against the manifest weight of the evidence. *E.g., Abrahamson*, 153 Ill. 2d at 88. Under this specific analytical framework, it is not our task–contrary to the position taken by the dissent–to review whether there is evidence to support the conclusions drawn by the appellate court.

It is our holding that the record in this case reveals a factual dispute as to plaintiff's impairment and disability at the time that the Board rendered its finding of facts and made its determination as to plaintiff's eligibility for a disability pension. The record contains conflicting evidence–both medical and nonmedical–with respect to plaintiff's eligibility for a disability pension. Faced with this conflict of evidence, it was the Board's function, as the finder of fact, to assess the credibility of the documentary information and the testimony of the witnesses and to determine the appropriate weight to be given the evidence. As stated, the findings of fact of an administrative agency–such as the Board–are, by statute, held to be *prima facie* true and correct (735 ILCS 5/3–110 (West 2002)) and may only be reversed if they are against the manifest weight of the evidence–a very high threshold to surmount. So long as the record contains evidence supporting the agency's decision, that decision should be affirmed. *Commonwealth Edison Co.*, 102 Ill. 2d at 467. We hold that this is the case here.

The Board issued a comprehensive 11-page decision setting forth with specificity the reasons for denying plaintiff's claim for a disability pension. In its decision, the Board stated that not only was it presented with conflicting medical evidence with respect to whether plaintiff suffered from a psychological disability, but also that it heard conflicting testimony which cast doubt upon plaintiff's version of key disability-triggering events. The Board found it notable that plaintiff

refused to seek counseling after each of the shooting incidents, even though he claimed to be distressed by the events; that the anger that he previously expressed against Chief Osantowski–and the direct cause for his removal from active duty–had dissipated; and that plaintiff described himself as "normal," no longer under the care of Dr. Wahlstrom or taking prescription psychotropic medications. The Board also questioned the credibility of plaintiff's account, based upon the Board's view that not only was plaintiff's testimony inconsistent, but also that it was rebutted on several key points by other witnesses. The Board stated that it had assigned significant weight to the extent that the testimony of the other witnesses refuted plaintiff's version of events.

The Board also assigned "great weight" to the report authored by Dr. Harris and the opinions contained therein. The Board explained that Dr. Harris' report was "the most lengthy and thorough evaluation of [plaintiff]" and, therefore, determined it to be the "most credible and persuasive evaluation." In its decision, the Board observed that Dr. Harris had highlighted the contradictions in plaintiff's speech and behavior, and that the Board was persuaded by Dr. Harris' "sincere assessment of [plaintiff's] inconsistent statements and demeanor."

The Board also agreed with Dr. Harris' suspicion that plaintiff's repeated use of a derogatory racist slur to refer to African-Americans during the four medical interviews and plaintiff's expressed hatred toward African-Americans was "manufactured *** in order to obtain a disability pension that [plaintiff] is not entitled to." We also observe that even Dr. Rubens, in his report finding plaintiff to be disabled, found it notable that plaintiff's judgment "seemed intact except in his dramatic descriptions of how he would shoot a[n] [African-American] if he had a gun and was on duty and saw one." Dr. Rubens wrote that he believed plaintiff's statements "to be somewhat dramatized and it is doubtful that he would, in fact, do so but it is possible." In addition, Dr. Rubens–like Dr. Harris–noted with interest that plaintiff continued to carry a gun despite his own expressed fears of what he might do as a result of his anger.

In its decision, the Board also focused on the observations made by Dr. Harris in his report that plaintiff's anger against African-Americans and his discussion of the shooting incidents arose only after plaintiff had been in treatment with Dr. Wahlstrom for nearly

-35-

two years, at a time which coincided with plaintiff's filing and pursuing his application for a disability pension. Indeed, according to Dr. Harris, even Dr. Wahlstrom found this sudden hostility to be unusual and "bizarre," and there was no clear explanation as to why plaintiff suddenly began to express this hatred. We note that in plaintiff's own testimony before the Board, he confirmed that at the start of his therapy with Dr. Wahlstrom, the focus was on his anger toward Chief Osantowski and plaintiff's difficulties with his girlfriend, Sheila. Plaintiff testified that as his therapy continued, he began to discuss the shootings with Dr. Wahlstrom, but offered no explanation as to why there was a delay in these issues surfacing. We also note that, although plaintiff expressed great hatred and animosity toward African-Americans in his medical interviews, and that this hostility led Drs. Rubens, Conroe and Ganellen to find plaintiff to be disabled and unable to return to active duty, any discussion of African-Americans and plaintiff's hatred towards this group was conspicuously absent from his testimony before the Board.

In addition, the Board also noted in its decision that although it was undisputed that plaintiff had said inflammatory things in the past, this did not necessarily mean that plaintiff was unable to perform his duties as a police officer. Although the Board observed that the doctors who evaluated plaintiff found that plaintiff had become disillusioned with the Department as a result of the FBI investigation and plaintiff's perception that the Department was not supportive of him, and that Dr. Wahlstrom had found plaintiff to be "burned out," the Board agreed with Dr. Harris that being disillusioned with one's job and being "burned out" did not constitute a psychiatric disorder.

In light of the above, we hold that the Board's decision to deny plaintiff a disability pension was not against the manifest weight of the evidence. The record contains sufficient evidence to support the Board's decision, and we cannot say that it is clearly evident that the Board should have reached the opposite conclusion and grant plaintiff a disability pension.

In his brief to this court, however, plaintiff notes that under the Pension Code, he is owed a fiduciary duty by the Board, and that this militates in favor of our setting aside the decision of the Board denying him a disability pension. We agree with plaintiff that the Pension Code establishes that a pension board owes a fiduciary duty

toward its participants and beneficiaries. *Board of Trustees of the Barrington Police Pension Fund v. Village of Barrington Ethics Board*, 287 Ill. App. 3d 614, 616 (1997). Section 1–109 of the Pension Code provides in relevant part that:

> "A fiduciary with respect to a retirement system or pension fund established under this Code shall discharge his or her duties with respect to the retirement system or pension fund solely in the interest of the participants and beneficiaries and:
>
> (a) For the exclusive purpose of:
>
> (1) Providing benefits to participants and their beneficiaries; and
>
> (2) Defraying reasonable expenses of administering the retirement system or pension fund;
>
> (b) With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.
>
> ***
>
> (d) In accordance with the provisions of the Article of the Pension Code governing the retirement system or pension fund." 40 ILCS 5/1–109 (West 2002).

This fiduciary duty, however, is owed to *all* participants in the pension fund, not just plaintiff. Perhaps the most important function of a pension board is to ensure adequate financial resources to cover the Board's obligations to pay current and future retirement and disability benefits to those who qualify for such payments. An important part of this responsibility involves the screening of unqualified or fraudulent disability claims, so that funds are not unfairly diverted to undeserving applicants. We believe that here, the Board fulfilled its duty to oversee and screen plaintiff's pension application as required under the Pension Code.

We note that plaintiff, in his brief to this court, also presents a short argument alleging that the delay by the Board in processing his claim for disability benefits violates "his due process rights" and serves as a "separate ground" for reversing the Board's denial of his disability pension benefits.

The United States Supreme Court has held that due process requires, *inter alia*, a hearing at a meaningful time. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 547, 84 L. Ed. 2d 494, 507, 105 S. Ct. 1487, 1496 (1985). Although the record before us reveals lengthy delays in initiating and completing plaintiff's hearing, it is not clear that–and plaintiff does not explain how–the delays resulted in a deprivation of plaintiff's due process rights. Indeed, there is no indication from the record that these delays impacted the Board's decision.

Further, in his brief, plaintiff cites to several cases which he contends support his due process argument. However, plaintiff's reliance on *Lyon v. Department of Children & Family Services*, 335 Ill. App. 3d 376 (2003), *Cavarretta v. Department of Children & Family Services*, 277 Ill. App. 3d 16 (1996), and *Stull v. Department of Children & Family Services*, 239 Ill. App. 3d 325 (1992), is misplaced, as these decisions are factually distinguishable from the matter before us. In each of the cited cases, the Department of Children and Family Services (DCFS) was held to have violated the due process rights of the plaintiffs by failing to conduct administrative proceedings within stated *statutory* deadlines for those proceedings. As a result, DCFS was found to have unreasonably delayed the proceedings. In the instant cause, no similar time limitations are found within the pertinent sections of the Pension Code.

In addition, we disagree with plaintiff's entreaties both in his brief to this court and also in his petition for rehearing requesting that this court, in essence, declare a bright-line rule that once an agency's delay in processing a disability benefits claim passes a certain point in time, that delay automatically violates due process. Not only are we unwilling to impose such a mandatory deadline on municipal and agency decisions, the United States Supreme Court has rejected such reasoning. In *Heckler v. Day*, 467 U.S. 104, 81 L. Ed 2d 88, 104 S. Ct. 2249 (1984), the plaintiffs filed a class action lawsuit seeking declaratory and injunctive relief on behalf of individuals who sought social security disability benefits and who had suffered substantial delays in scheduling and issuance of decisions. The Court rejected the arguments advanced by plaintiffs, noting that "Congress repeatedly has been made aware of the long delays associated with resolution of

disputed disability claims and repeatedly has considered and expressly rejected suggestions that mandatory deadlines be imposed to cure that problem." *Heckler*, 467 U.S. at 111, 81 L. Ed. 2d at 96, 104 S. Ct. at 2253. Recognizing that "in Congress the concern that mandatory deadlines would jeopardize the quality and uniformity of agency decisions has prevailed over consideration of timeliness" (*Heckler*, 467 U.S. at 114, 81 L. Ed. 2d at 98, 104 S. Ct. at 2255), the Court concluded that it had no authority to impose the very deadlines that Congress had repeatedly rejected. *Heckler*, 467 U.S. at 118, 81 L. Ed. 2d at 100, 104 S. Ct. at 2257.

Although we agree with plaintiff in the matter at bar that a disability claimant is entitled to a timely hearing and decision on his or her application for benefits, we recognize–as did the *Heckler* opinion–that the time required before a well-reasoned and sound decision on such an application can be made will vary widely on a case-by-case basis. Indeed, establishing strict or bright-line time limits for these types of decisions could result in incorrect rulings where the deciding body is pressured for time in complex or difficult cases. Accordingly, a case-by-case assessment must be made to determine whether, under the specific facts and circumstances presented, the claimant was deprived of due process. In the matter at bar, under the specific facts and circumstances detailed at length in this opinion, we conclude that plaintiff's due process claim fails.

Because we uphold the decision of the Board denying plaintiff's application for a disability pension on the basis that plaintiff failed to satisfy his burden of proof that he was disabled, we need not address the Board's alternative argument with respect to the constitutionality of section 3–115 of the Pension Code. It is well settled that "questions regarding the constitutionality of statutes should be considered 'only where essential to the disposition of a case, *i.e.*, where the case cannot be determined on other grounds.' " *Hearne v. Illinois State Board of Education*, 185 Ill. 2d 443, 454 (1999), quoting *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 396 (1994); see also *People v. Lee*, 214 Ill. 2d 476, 482 (2005); *In re Detention of Swope*, 213 Ill. 2d 210, 218 (2004), quoting *In re S.G.*, 175 Ill. 2d 471, 479 (1997) (as a general rule, courts avoid deciding constitutional questions when other, nonconstitutional grounds exist for resolving the case).

Indeed, we recently addressed a factually analogous situation in *Turcol v. Pension Board of Trustees of the Matteson Police Pension Fund*, 214 Ill. 2d 521 (2005). In *Turcol*, the appellate court confirmed the pension board's decision in that case to deny the plaintiff a line-of-duty disability pension. However, the appellate court then went on to address the plaintiff's argument that section 3–115 of the Pension Code was unconstitutional and rejected it. We then granted the plaintiff's petition for leave to appeal in order to resolve a conflict regarding the construction of the three-physician requirement contained in section 3–115. We subsequently determined, however, that leave to appeal in *Turcol* had been improvidently granted, as "[i]t is fundamental that courts should consider the constitutionality of a statute only when necessary to decide the case." *Turcol*, 214 Ill. 2d at 524. We noted that the record revealed that the pension board in that case had declined to award the plaintiff a disability pension on the alternative ground that the plaintiff had failed to prove his disability. Therefore, the appeal in *Turcol* was dismissed.

Accordingly, we vacate that portion of the appellate court's judgment holding that section 3–115 of the Pension Code is unconstitutional as applied to plaintiff.


CONCLUSION

For the foregoing reasons, we reverse the judgment of the appellate court. We also vacate that portion of the appellate court's judgment holding section 3–115 of the Pension Code unconstitutional as applied to plaintiff. The order of the circuit court of Cook County is affirmed.


*Appellate court judgment reversed*
*in part and vacated in part;*
*circuit court judgment affirmed.*


JUSTICES KILBRIDE and BURKE took no part in the consideration or decision of this case.


JUSTICE FITZGERALD, dissenting:


-40-

The majority opinion reverses the appellate court and upholds the Board's decision denying plaintiff a disability pension. Because the majority opinion is based on the faulty premise that the appellate court misread the record in this case, and because the majority opinion fails to address the threshold issue raised on appeal, I dissent.

During the appellate court's discussion of the background of this case, the court summarized the medical evidence considered by the Board, including Dr. Harris' report. 361 Ill. App. 3d at 9-14. Later, in its analysis of the issues, the appellate court concluded that "all of the mental health professionals, including Dr. Harris, agreed that at the time of his removal from active duty [plaintiff] was suffering from a psychiatric impairment that rendered him unable to function as a police officer." 361 Ill. App. 3d at 17-18. According to the majority opinion, the appellate court misread Dr. Harris' report by failing to place a certain passage from that report in the "proper positional context." Slip op. at 32. I disagree.

Although Dr. Harris' report made plain his view that plaintiff was not currently disabled, his report also repeatedly acknowledged plaintiff's past psychiatric disorder and disability. Dr. Harris stated:

> "*Given that [plaintiff] had a clear psychiatric disturbance warranting time off from work*, he had a full year of paid disability. This time off resulted in the reduction of his angry feelings toward the chief. It was the threat to the chief that prompted the *medical leave* from work. He has had sufficient time to recover from the *acute problems* he experienced in July-September 1996. He is *no longer* suffering from a *psychiatric disability*.

> * * *

> Officer Marconi is not presently and has not been suffering *(at least since 10/6/97*) from a psychiatric disorder interfering with his functioning.

> * * *

> *The psychiatric impairment that resulted in medical leave from work* ended as far back as, and most likely well before 10/6/97." (Emphases added.)

In addition, Dr. Harris' stated diagnosis was "Major Depressive Disorder, Single Episode, in Remission." This diagnosis, together

with the foregoing passages, clearly support the appellate court's reading of Dr. Harris' report. If the appellate court is to be reversed, it must be on some other basis.

The majority asserts that I am "confused" and have "lost sight" of the fact that "it is the decision of the *administrative agency*–here, the *Board*–that is under review, *not* the determination of the appellate court." (Emphases original.) Slip op. at 33. I am fully cognizant of the decision this court has been called upon to review. What is confusing, however, is the difference between the majority's analysis of the case and its analysis of my dissent. According to the majority opinion, the majority may scrutinize the appellate court's reading of the record in this case as part of its review of the Board's decision (slip op. at 32-33), but I am precluded from conducting the same analysis and reaching a contrary conclusion.

In any event, even if I agreed with the majority that the appellate court misread Dr. Harris' report, I would nonetheless dissent because the majority fails to consider the threshold issue in this case, namely, whether the Board could properly consider evidence of plaintiff's current medical condition, as opposed to evidence of his condition at the time he was removed from active duty or at the time he applied for a disability pension. Relying on *Hahn v. Police Pension Fund*, 138 Ill. App. 3d 206 (1985), the appellate court concluded that plaintiff's medical condition at or near the time of his removal from active duty was the only relevant medical evidence the Board should consider in making its initial determination of eligibility for a disability pension. Evidence of plaintiff's condition at a later date, which may indicate he improved with therapy, is inappropriate for consideration at the initial eligibility determination. Rather, such evidence is properly considered as part of the statutory process to verify continuing eligibility. 361 Ill. App. 3d at 17. The appellate court concluded that, under the authority of *Hahn*, the Board's denial of plaintiff's application for a disability pension was clearly erroneous in light of the medical evidence speaking to plaintiff's condition "at the time of his removal from active duty." 361 Ill. App. 3d at 18. The majority overlooks this part of the appellate court opinion, notwithstanding the Board's argument before this court that it should not be restricted in the medical evidence it may review. Indeed, the Board urges this court to overrule *Hahn*.

Significantly, the appellate court's determination that the Board may only consider evidence relevant to plaintiff's medical condition at the time of his removal from active duty, and that the evidence here supported a finding of disability, compelled the appellate court to consider the Board's alternative argument for affirming the denial of a disability pension–plaintiff's failure to submit three certificates of disability from Board-appointed physicians, pursuant to section 3–115 of the Illinois Pension Code (40 ILCS 5/3–115 (West 2002)). After considering this issue, the appellate court held the statute unconstitutional as applied to plaintiff. 361 Ill. App. 3d at 29.

Although consideration of the *Hahn* issue by this court would not necessarily result in the court's consideration of the constitutional issue, the failure to consider the *Hahn* issue does remove any possibility of reaching the constitutional question. I would address the *Hahn* issue that the Board raises on appeal and let our disposition of that issue dictate the direction the rest of the opinion should take. By failing to address this issue, the lower courts are left to wonder whether *Hahn* has been overruled by this court *sub silentio* or simply ignored.

For these reasons, I dissent.