**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 200008-U

Order filed July 9, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| RICHARD GIROT, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-20-0008 |
| | ) | Circuit No. 19-MR-549 |
| BOARD OF TRUSTEES OF THE | ) | |
| BRAIDWOOD POLICE PENSION FUND, | ) | |
| | ) | Honorable Matthew G. Bertani, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice McDade and Justice Holdridge concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The decision by The Board of Trustees of the Braidwood Police Pension Fund denying plaintiff's claim for a not-on-duty disability pension is against the manifest weight of the evidence.

¶ 2    The Board of Trustees of the Braidwood Police Pension Fund (Board) denied both a line-of-duty and not-on-duty disability pension to plaintiff, Richard Girot. Girot filed his complaint for administrative review with the circuit court. After review, the court affirmed in part and reversed in part. The court found the Board's decision denying Girot a not-on-duty disability pension

against the manifest weight of the evidence. The Board appeals. For the reasons that follow, we reverse the decision of the Board denying a not-on-duty disability pension.

¶ 3                                    I. BACKGROUND

¶ 4        Girot served as a Will County Deputy Sheriff in a patrol capacity for a period of approximately 22 years with his service ending in 2010. It is undisputed that he suffered certain injuries to his body during his tenure with the Will County Sheriff's Police, ultimately resulting in a determination in a workers' compensation matter that he suffered a permanent disability to his left leg. He had at least two surgical procedures on his left knee prior to his hire as the chief of police for Braidwood. Girot continued to have knee issues in the six months immediately preceding his hire. He also suffered numerous injuries to his shoulders and other parts of his body.

¶ 5        The mayor of Braidwood hired Girot as the chief of police for the Village of Braidwood for a four-year term starting April 28, 2011, and ending April 28, 2015, as set forth in a contract memorializing the arrangement. At that time, Girot became a member of the Braidwood police pension fund. The majority of duties of the chief of police are administrative but also included duties such as,

> "6. Plans, coordinates, or administers training of employees in policies, rules and regulations, and general orders, in the performance of their duties thereby, and in the proper use of equipment.
>
> ***
>
> 9. Attends civic and school meetings to explain the activities and functions of the police department, and to establish partnerships, and devise solutions for community problems."

The job description for chief of police also required,

"demonstrated ability to lead and direct police officers; ability to maintain cooperative relationships with other town officials and with the general public; ability to evaluate police effectiveness and to institute improvements to police business; ability to recruit, screen, and hire officers; physically fit; ability to prepare and review reports; resourcefulness and sound judgment; demonstrated integrity and good moral character; tact; ability to draft policies."

¶ 6    After Girot's hire as chief, three incidents took place that are relevant to this appeal. First, on July 17, 2011, Girot tripped on a split in the concrete outside of the station twisting his right ankle and injuring his left hand. Second, on January 17, 2012, Girot received a total left knee replacement in an attempt to alleviate symptoms from knee injuries suffered prior to becoming chief. Subsequent to the knee replacement, Girot developed complex regional pain syndrome[1] (CRPS). Third, on October 17, 2012, he tripped on a piece of loose concrete, twisting his left ankle, injuring his left foot, and tearing the rotator cuff in his left shoulder. Both of the falls were captured on surveillance cameras.

¶ 7    Girot filed an application for disability on April 21, 2015, seven days before his last day of duty, solely making a claim for a line-of-duty disability pension pursuant to section 3-114.1 of the Illinois Pension Code (Code) (40 ILCS 5/3-114.1 (West 2014)). Girot claims that he injured

---

[1] "[CRPS] is a broad term describing excess and prolonged pain and inflammation that follows an injury to an arm or leg." National Institute of Neurological Disorders and Stroke, *Complex Regional Pain Syndrome Fact Sheet*, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Complex-Regional-Pain-Syndrome-Fact-Sheet (last visited March 29, 2021). "People with CRPS have changing combinations of spontaneous pain or excess pain that is much greater than normal following something as mild as a touch." *Id.* "Other symptoms include changes in skin color, temperature, and/or swelling on the arm or leg below the site of injury." *Id.* "Although CRPS improves over time, eventually going away in most people, the rare severe or prolonged cases are profoundly disabling." *Id.*

himself in the two falls outside the police department while employed by Braidwood in July 2011, and October 2012. He asserts that these falls led to a permanent disability, and the injuries occurred when he was performing his duties as chief of police. As such, this entitled him to a line-of-duty disability pension. Two years after Girot filed his application, the Board sent him for examinations by three independent medical examiners (IMEs).

¶ 8                                          A. Independent Medical Exams

¶ 9         All three of the IMEs received and reviewed Girot's medical records as well as the job description for the chief of police of Braidwood.

¶ 10                                          1. *Dr. Daniel G. Samo*

¶ 11         Dr. Daniel G. Samo presented two reports to the Board. In Samo's opinion, Girot was disabled and unable to perform the duties of chief. A physical exam of Girot's left ankle and foot revealed "bluish" discoloration in the foot in comparison to the right, as well as a loss of pin sensation over the lateral ankle and dorsum of the foot.

¶ 12         Samo did not believe that any of the physical injuries from the two falls complained of by Girot were the reason for his disability. Further, neither of the falls resulted in an injury that rendered Girot unable to perform his duties of chief. Instead, Samo found the cause of Girot's disability to be the CRPS and treatment thereof, specifically the chronic use of several opiates and other medication to control the chronic pain from the CRPS. According to Samo, this would impact Girot's executive decision-making abilities, cause memory problems, and issues with alertness along with lethargy, dizziness, fatigue, and depression. Samo stated this would "obviously affect many of the essential job tasks of a chief." He believed the likely cause of the CRPS was the total knee replacement.

¶ 13                                          2. *Dr. Steve M. Gnatz*

¶ 14     Dr. Steve M. Gnatz also presented two reports to the Board. Gnatz noted that Girot took on the job of chief of police with "significant pre-existing disability." However, this did not preclude Girot from performing his duties as chief. Gnatz found that the cumulative effect of the falls complained of by Girot resulted in an additional minor disability to the left hand and shoulder. Gnatz also found Girot disabled due to CRPS, which limited his walking ability and led to pain limiting his "functional status." He believed the CRPS was a result of the total knee replacement. After reviewing the job description for the chief of police, Gnatz believed the foremost obstacles to Girot's fitness for duty as chief were "his complaints of pain with walking and his ongoing need for opioid pain medications." Gnatz specifically noted that certain duties of chief would exceed Girot's ability to ambulate and his physical capabilities in general.

¶ 15                                    3. *Dr. Paul Belich*

¶ 16     Dr. Paul Belich opined that Girot was disabled. He stated, "[Girot] could only do very limited office and ceremonial duties as Chief of Police if he desired." Belich cited Girot's CRPS as the reason for the disability finding. He further found that any attempt to rehabilitate Girot would be futile noting the longstanding nature of the disability and numerous failed attempts at rehabilitation.

¶ 17                                    B. Medical History

¶ 18     Girot's medical records are also in the record and are voluminous. Included are the records from his numerous personal physicians, as well as the reports of the IMEs from the workers' compensation case.

¶ 19                                    1. *Dr. Kevin Walsh*

¶ 20     Dr. Kevin Walsh was one of the IMEs in Girot's workers' compensation case. He examined Girot on August 18, 2009. According to Walsh, Girot reported pain in his left knee that was

"terrible" with "popping, snapping, and locking" and that he could not walk "50 feet." Walsh noted imaging of the knee revealed a medial meniscus tear and grade three chondromalacia of the patella commonly referred to as runner's knee. Walsh did not believe surgery on the knee injuries was necessary and initially suggested Girot return to light duty, reserving a decision regarding the return to full duty pending imaging of the knee. Walsh would later suggest a return to duty without restrictions.

¶ 21                    2. *Dr. Bradley Dworski*

¶ 22        Dr. Bradley Dworski performed multiple knee surgeries on Girot. In October 2009, he performed an arthroscopic chondroplasty on Girot's left knee. Dworski then performed a partial replacement on the left knee in May 2010. Initially, the results were promising, but Girot continued to have difficulty with bending and squatting, along with sharp pain when rising from a seated position and recurrent swelling. In his records, Dworski notes that he discussed a total left knee replacement with Girot as far back as 2009, stating the procedure was likely inevitable. Following the partial replacement, Dworski reported that the inability to impact the left knee, limitations on deep squatting and crawling, as well as limitations on repetitive flexion such as climbing would be a "permanent problem." Relaying this opinion in the workers' compensation case, Dworski stated the permanent limitations precluded Girot from returning to service as a patrol officer with the Will County Sheriff's Police.

¶ 23        Dworski then performed an arthroscopic partial lateral meniscectomy on the left knee in July 2011. After the partial knee replacement failed, Dworski believed it was best to proceed with a total knee replacement and did so in January 2012. Approximately two months after the total knee replacement, Girot began complaining of pain in his left knee, ankle, and foot. Eight months

out from surgery, Girot was still experiencing shooting pain and a burning sensation. The pain was not subsiding and impacting Girot's "ability to get around."

¶ 24                                 3. *Dr. Gary Kohen*

¶ 25        Dr. Gary Kohen assisted in formulating Girot's pain management regimen suspecting CRPS following the total knee replacement. Kohen diagnosed Girot with CRPS in 2013 and started him on a regimen of opioids, sedatives, and nerve pain medication. In an effort to further reduce the symptoms of CRPS, Kohen then administered a series of lumbar sympathetic blocks. This resulted in some symptom improvement, but the burning sensation remained unchanged and ultimately this course of treatment was unhelpful. Kohen added an additional opioid and a topical anesthetic to the medication regimen as the previous regimen was minimally effective and the CRPS worsened.

¶ 26        After conservative treatment failed to alleviate the CRPS, a single lead neurostimulator electrode array, more commonly referred to as a spinal cord stimulator (SCS), was implanted in Girot's back to control the pain. Even after implantation of the SCS device and modification of the medication regimen, Girot still experienced chronic pain that radiated into his left foot and corresponding numbness.

¶ 27                                 4. *Dr. Kevin Kelly*

¶ 28        Dr. Kevin Kelly implanted the SCS device and noted that prior to the procedure Girot was becoming more desperate as time went on. The pain started after the total knee replacement and had been ongoing for two years when Kelly first examined him. When describing the pain in Kelly's office, Girot stated it "often feels like he wants to amputate his leg or should shoot it off with a gun." Girot had discontinued taking some of his prescribed medication because it did not alleviate his pain and he noticed "cognitive side effects." After implantation of the SCS, Kelly

described Girot as significantly better, but Girot still experienced severe pain that the device did not cover. While Girot maintained the medication regimen after implantation of the SCS device, additional medication was ineffective in controlling the remaining pain. Subsequently, Kelly performed a second surgery to correct placement issues with the SCS device. Ultimately, the device was removed as it became ineffective at controlling the pain.

¶ 29                     5. *Dr. Marc Asselmeier*

¶ 30        Dr. Marc Asselmeier performed left shoulder surgery on Girot following the 2012 fall. Girot reported a significant decline in strength and function of the shoulder following the fall. Imaging of the shoulder revealed a superior labral tear and injury to the rotator cuff. Following surgery, significant improvement in the shoulder was noted. Corticosteroid injections were still given to ease inflammation and pain. In July 2013, Asselmeier documented Girot's complaints of pain following the left total knee replacement as well as chronic low back pain. Girot stated he was seeing a pain specialist who had discussed cauterizing his lumbar nerves. Asselmeier recommended a bone scan of the left knee, the results of which were unremarkable. In August 2013, Girot again complained of left leg pain, numbness, tingling in the knee, and burning in his left foot. Girot stated he was having a SCS implanted by Kelly. Asselmeier noted he had no good explanation for Girot's ongoing disability in the left leg, but it could potentially be chronic radiculopathy.

¶ 31                     C. Board Hearing

¶ 32        Twelve months after the independent medical examinations were complete, three years after the application was filed, the Board held a hearing on the merits of Girot's application. The hearing took place over two days in July and August 2018. At the beginning of the hearing, the

Board invited Girot to amend his application to include a claim for a not-on-duty disability pension pursuant to section 3-1142 of the Code (40 ILCS 5/3-1142 (West 2018)).

¶ 33    Girot testified, stating that in addition to his duties as chief of police, he would also engage in duties performed by patrol officers. He denied being disabled before taking the job of chief. Girot stated that he had put himself on light duty due to the falls and resulting injuries. After going through the job duties of chief, Girot stated he "had a hard time doing any of this." Specifically, he experienced difficulty in walking, negotiating stairs, and found the pain to be overwhelming at times. Girot stated that he did not take pain medication while he was on duty and, instead, waited until the end of his shift. Toward the end of his term as chief, a deputy chief of police was brought in to assist him.

¶ 34                                                  D. Board's Decision

¶ 35    Six months after the hearing, the Board entered its decision and order on February 6, 2019, denying all relief sought by Girot. As a threshold matter, the Board found the position of chief did not entail the duties of a patrol officer. Turing to the merits, the majority of the Board's decision focuses on Girot's previous injuries and his limitations prior to taking the job as chief. Relying on his previous medical records and the workers' compensation case, the Board found that Girot was no less disabled when he left the employ of the Village of Braidwood than when he joined it. The Board found that Girot's testimony lacked credibility. Also, that there was not competent evidence in the record to show that Girot retired or was suspended; he instead completed his term as chief on full duty. The Board cited to excerpts from the reports of all three of the IMEs to refute any causal link between the falls and the injuries complained of while ignoring the overall conclusions that Girot was disabled due to CRPS and the corresponding treatment. The Board, instead, found

- 9 -

that following the total left knee replacement, Girot "experienced a significant relief in discomfort and function" that existed prior to being employed as chief.

¶ 36 The Board went on to assume that even if Girot was disabled, "that during the *events* in question, [Girot] was not serving in a *capacity* constituting the performance of an 'act of duty' as required for entitlement to a 'line of duty' disability[.]" In sum, the Board found that Girot was not disabled necessitating his retirement or suspension. Therefore, he was entitled to neither a line-of-duty nor a not-on-duty disability pension benefit. Thereafter, Girot timely filed his complaint for administrative review with the circuit court.

¶ 37 E. Circuit Court's Order

¶ 38 The circuit court affirmed the Board's finding relating to the line-of-duty pension but ruled the Board's finding that Girot was not disabled or entitled to a not-on-duty pension was against the manifest weight of the evidence. The court agreed with the Board that the position of chief did not entail the duties of a patrol officer but found there was an "overwhelming" amount of evidence in the record that Girot developed CRPS after his total left knee replacement. The CRPS and dependence on opioid medication resulted in Girot being both unfit to serve as chief and to unable to perform the duties of chief.

¶ 39 The Board appeals the reversal in part by the circuit court. Girot did not file a cross-appeal.

¶ 40 II. ANALYSIS

¶ 41 The Board argues that the record is "replete with competent evidence" upon which it based its decision denying the not-on-duty disability pension. More to the point, the Board states that "Girot should not be allowed to profit by claiming that at the time he filed his application he was incapable of performing those very services which he was incapable of performing when he accepted employment with the [village]." The Board also argues that Girot's lack of credibility

contributed to its finding. The Board goes on to argue that Girot finished out his term, thereby evidencing that any disability did not necessitate retirement or suspension. Finally, the Board avers the circuit court reweighed the evidence when it found the decision to deny the not-on-duty pension against the manifest weight of the evidence.

¶ 42    Girot argues the evidence is "overwhelming" that the 2012 total knee replacement caused CRPS resulting in disability that necessitated a suspension of service. He also argues that the circuit court did not reweigh the evidence but thoroughly evaluated the record and took into account the considerable medical evidence in favor of Girot when coming to its decision.

¶ 43    Here, our role is to review the decision of the Board, not the circuit court's. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). Although reversed in part by the circuit court, our review remains focused solely upon the Board's decision. *Id.* The Administrative Review Law (735 ILCS 5/3–101 *et seq.* (West 2018)) governs our review of the Board's decision. See 40 ILCS 5/3-148 (West 2018).

¶ 44    Pursuant to the Administrative Review Law, the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2018). Rulings on questions of fact, such as the denial of a disability pension, will be reversed only if they are against the manifest weight of the evidence. *Marconi*, 225 Ill. 2d at 532. "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

¶ 45    Since the weight of the evidence and credibility of the witnesses are within the province of the Board, there need only be some competent evidence in the record to support its findings. *Hahn v. Police Pension Fund of City of Woodstock, McHenry County, Illinois*, 138 Ill. App. 3d 206, 209

(1985). Nonetheless, "[e]ven when the decision is supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient if upon a consideration of all the evidence the finding is against the manifest weight." *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 211-12 (2006). We retain the duty to examine the evidence in an impartial manner and to set aside an order unsupported by the evidence. *Rhoads v. Board of Trustees of the City of Calumet City Policemen's Pension Fund*, 293 Ill. App. 3d 1070, 1076 (1997).

¶ 46        The principal issue before this court is whether the Board's decision to deny a not-on-duty disability pension is against the manifest weight of the evidence. The pertinent statutory section provides,

> "A police officer who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service in the police department, shall be entitled to a disability pension of 50% of the salary attached to the officer's rank on the police force at the date of suspension of duty or retirement." 40 ILCS 5/3-114.2 (West 2018).

Essentially, this section requires that for an individual to acquire a not-on-duty disability pension, the individual must show he or she (1) is a police officer; (2) suffers an injury from something other than an act of duty; (3) is found to be physically or mentally disabled due to that injury; and (4) the disability necessitated retirement or suspension. Here, only the existence of a disability and whether that disability necessitated retirement or suspension are in dispute.

¶ 47        At the outset, we note that it is well established that the rules governing pensions of police and firemen are liberally construed in favor of those to be benefitted. *Robbins v. Board of Trustees of Carbondale Police Pension Fund of City of Carbondale, Illinois*, 177 Ill. 2d 533, 545 (1997). It is with this in mind that we review this matter.

¶ 48                                        A. Disability

¶ 49        All three of the IMEs found Girot disabled. Two of them, Samo and Gnatz, found that because of Girot's chronic use of opioid and other medication, he could not perform the duties of chief of police. Belich found that the CRPS itself resulted in disability. The CRPS made walking and navigating stairs extremely difficult. The treatment of the condition required a pain management regimen that included several medications that could impact Girot's executive decision-making abilities, memory, alertness, and cause lethargy, dizziness, fatigue, and depression. Girot reported to Kelly that two prescribed medications impacted his cognitive abilities. Further, all three IMEs referenced the pain associated with walking, and Girot's limited general physical capabilities in finding him unfit to perform as chief of police.

¶ 50        Even a cursory review of the medical records show that Girot was on an extensive regimen of opioid and other medication to control the CRPS symptoms. Dr. Kohen's records reveal a laborious process of mixing different opioid and nerve medications, lumbar injections, topical anesthetic, sedatives, and implantation of a spinal stimulation device in an attempt to alleviate the CRPS.

¶ 51        The Board contends that "[t]he etiology of CRPS is unknown." We disagree. Medical records after Girot's hire as chief diagnose him with CRPS. CRPS does not appear as a diagnosed ailment in Girot's medical records prior to his hire as chief of police. Samo and Gnatz opined that the total left knee replacement was the likely cause of the CRPS. The medical records evidence a

consensus that the CRPS did not manifest until after the total knee replacement surgery, which took place after Girot's hire as chief.

¶ 52    The Board overlooked the CRPS diagnosis and concerns surrounding the treatment thereof that appears numerous times not only in the IMEs' reports but also the records of Girot's own doctors. Instead, the Board decided to rely on medical reports prior to Girot's employment as chief and prior to his development of CRPS. See *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 507 (2007) (finding the Board erred in assigning greater weight to a physician's opinion when his conclusions were inconsistent with the facts and his opinion did not rely on relevant, material evidence that was key under the circumstances); accord *Hampton v. Board of Trustees of Bolingbrook Police Pension Fund*, 2021 IL App (3d) 190416, ¶ 21. The Board also parsed Dr. Samos' report to support its finding when, in fact, his report rebuts it. As noted by all three of the IMEs, the development of CRPS after the total left knee replacement served to completely disable Girot from serving as chief.

¶ 53    In contrast to its decision and order in this matter, the Board acknowledges in its briefing that all three of the IMEs found Girot disabled. Despite this, the Board contends that the disability finding by all three IMEs is not dispositive as the Board may require "other evidence of disability." See 40 ILCS 5/3-115 (West 2018). We find the hundreds of pages of medical records describing Girot's ongoing battle with CRPS and treatment thereof provides other evidence of disability. See *Pierce v. Board of Trustees of Police Pension Fund of City of Waukegan*, 177 Ill. App. 3d 915, 922 (1988) (finding denial of disability pension to police officer was against the manifest weight of the evidence where the opinions of the IMEs selected by the Board and the officer's treating physician combined with the totality of the evidence led to the conclusion the officer could not

return to unlimited, full-time duty). The Board relied on medical evidence prior to Girot's hire and failed to consider the CRPS diagnosis. See *Wade*, 226 Ill. 2d at 507.

¶ 54    We must also note that the Board's attempt to discredit the IMEs' opinions due to a two-year delay between the filing of the application and when the Board scheduled the exams is disingenuous. Our review of the record fails to reveal any delay caused by Girot, nor does the Board point to any. Instead, the Board claims its dilatory approach was due to Girot's lack of protest to the length of the process. We refuse to indulge the Board and incentivize scheduling examinations in such a manner.

¶ 55    Further, while the Board argues that Girot's credibility factored into its finding, the medical evidence speaks volumes on the subject of disability. Without a doubt, Girot's testimony regarding the recollection of dates and symptoms of his various injuries and surgeries is inconsistent. Regardless, all the IMEs received and reviewed Girot's medical history and the job description for the chief of police. Girot's medical history, along with the opinions of the IMEs, leads to the inescapable conclusion that Girot either by way of his CRPS or corresponding medicinal treatment, is, in fact, disabled and unfit to perform his duties of chief. See *Pierce*, 177 Ill. App. 3d at 922.

¶ 56    Accordingly, the Board's finding that Girot was no less disabled when he took the job as chief than when he left is against the manifest weight of the evidence. See *Bowlin*, 368 Ill. App. 3d at 211-12.

¶ 57                                    B. Retirement or Suspension

¶ 58    Next, the Board argues that by completing his term of employment as chief, Girot has failed to establish an element of his claim that his disability necessitated retirement or suspension.

¶ 59    Girot's CRPS, chronic use of opioid and other medication, and limited physical capabilities necessitated his suspension or retirement. Girot admitted to his own doctor that he discontinued

certain medications in his pain management regimen because of cognitive side effects. The job requirements for chief make plain the officeholder must be physically fit and exercise sound judgment. Following the total left knee replacement, it is clear Girot was not physically fit. Further, the chronic pain from his CRPS and the pain management medication, either acting alone or in concert, could impact Girot's sound judgment and executive decision-making abilities. Girot was unfit to serve as chief and his condition necessitated his suspension or retirement as he was unable to perform the duties of chief. See *Batka v. Board of Trustees of the Village of Orland Park Police Pension Fund*, 186 Ill. App. 3d 715, 722 (1989) (noting the Code section is "premised upon a finding that the plaintiff's disability rendered him unfit for duty"). Our decision finds additional support in that toward the end of Girot's tenure, a deputy chief of police was appointed to assist Girot.

¶ 60       The Board laments numerous times that Girot filed his application immediately prior to the end of his contractual term of employment for the sole purpose of securing "a pension he was not otherwise entitled to." As discussed, we find Girot's CRPS necessitated his retirement or suspension, entitling him to a not-on-duty pension. Further, it is important to stress that filing the application one week before the completion of Girot's contractual term is immaterial to our analysis. See *Rhoads*, 293 Ill. App. 3d at 1076 (finding a police chief was entitled to a disability pension after filing application two days before discharge).

¶ 61       Finally, the Board argues the circuit court improperly reweighed the evidence during its administrative review. Nevertheless, it is the Board's decision and order that is reviewed in this court, not the circuit court's order. However, the assertion by the Board that there is only a "paucity of medical reports suggesting Girot was afflicted with CRPS" is clearly incorrect. Our findings above render this argument moot. Thus, we do not address it further.

¶ 62 Girot was disabled as a result of something other than the performance of an act of duty that necessitated his retirement or suspension. Ergo, Girot is entitled to a not-on-duty disability pension.

¶ 63 III. CONCLUSION

¶ 64 For the foregoing reasons, we reverse in part the decision of the Board of Trustees of the Braidwood Police Pension Fund and affirm the circuit court of Will County.

¶ 65 Board decision reversed in part.