**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220093-U

Order filed March 24, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| ARTHUR SZYMALA, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | |
| ROMEOVILLE FIREFIGHTERS' PENSION | ) | |
| FUND, THE BOARD OF TRUSTEES OF | ) | |
| THE ROMEOVILLE FIREFIGTHERS' | ) | |
| PENSION FUND, the members of the Board | ) | Appeal No. 3-22-0093 |
| of Trustees of the Romeoville Firefighters' | ) | Circuit No. 21-MR-937 |
| Fund, PRESIDENT MARTY HENRY, | ) | |
| SECRETARY MICHAEL SPRADAU, | ) | |
| TRUSTEE EDWARD PANZER, and | ) | |
| TRUSTEE KIRK OPENCHOWSKI, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Romeoville Firefighters' Pension Fund, | ) | John C. Anderson, |
| Defendant-Appellee). | ) | Judge, Presiding. |

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Albrecht and McDade concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The Board's determination that the plaintiff was not disabled was not against the manifest weight of the evidence.

¶ 2 The plaintiff, Arthur Szymala, applied to the Board of Trustees of the Romeoville Firefighters' Pension Fund (Board) for a line-of-duty disability pension pursuant to section 4-110 of Illinois Pension Code (Code) (40 ILCS 5/4-110 (West 2018)). Alternatively, the plaintiff requested a not-in-duty disability pension pursuant to section 4-111 of the Code (40 ILCS 5/4-111 (West 2018)). The plaintiff claimed that he was disabled due to his posttraumatic stress disorder (PTSD) and major depressive disorder. The Board found that the plaintiff was not disabled and denied both disability pension requests. The plaintiff sought review of the Board's decision before the circuit court, which affirmed the Board's determinations.

¶ 3                                           I. BACKGROUND

¶ 4 The following factual recitation is taken from the Board's findings and decision dated February 18, 2021. In April 2005, the plaintiff was hired as a full-time firefighter and entered into the pension fund. He passed physical fitness training and a medical examination. The plaintiff performed various duties for the fire department, including responding to fires and emergency medical service calls and participating in training exercises.

¶ 5                                            A. The Fall

¶ 6 In June 2007, the plaintiff and his crew were participating in a self-rescue window bailout drill at the fire station. The plaintiff testified that he was positioned on the third floor of the training tower and proceeded to descend from the third story to the ground using training ropes. As he crawled out of the window, he recalled hearing a snapping sound, a rope ripped out of his hands, and he fell to the ground. The plaintiff testified that he first landed on his buttocks on the pavement then the rest of his body hit the ground. He looked up and saw his belt suspended above the ropes. The plaintiff testified that he felt sleepy and did not recall anything until he awoke in the hospital.

¶ 7 Immediately following the fall, the plaintiff reported to the attending physician that his

harness broke and he "fell a distance of approximately 15 feet, and rolled down the side of the wall, and to the floor, where he led with his left heel, and landed on his buttocks." The physician provided that the plaintiff experienced immediate pain and discomfort in his lower back and heels, but suffered no head injury (noting that the plaintiff also reported that his helmet hit a metal pole while going down). The records indicated that the plaintiff suffered no loss of consciousness (contrary to his testimony), neck pain, numbness, or tingling. X-rays of his spine and heels showed no abnormalities. The plaintiff was released from the hospital after about two hours and prescribed medication for his pain and inflammation.

¶ 8                              B. Events Following the Fall

¶ 9        About a week later, the plaintiff was released to return to work. He completed an employee injury report where he stated that he fell approximately 15 feet; suffered an injury to his right sacral area, left heel, and lower back; and recovered from the injury. On the same date, in a separate letter providing a summation of the events from the fall, he provided that he fell approximately 15 feet, landed on his behind, and his helmet struck a metal pole. The plaintiff provided that his injuries were confined to his lower back, right hip, and his heels. At least twelve other members of the fire department completed intradepartmental memoranda on what they witnessed, generally stating that the plaintiff fell 15 to 20 feet, the belt snapped, and he tried to rappel down the ropes but his grip slipped. The witnesses reported that he fell either on his buttocks or on the back of his heels then his buttocks. None of the witnesses reported that he landed on his head or hit a pole.

¶ 10        The plaintiff testified that, he was told by the deputy chief years later, his helmet needed to be replaced following the fall because it cracked after hitting a metal pole. He had no independent recollection of striking a metal pole and never noticed a crack in his helmet. The plaintiff was provided a new helmet when he returned to work. Since the fall, he routinely climbed

3

on ladders and roofs for training and calls. The plaintiff continued to perform capably.

¶ 11        In 2013, the plaintiff was promoted to lieutenant following a competitive promotional testing process. However, he testified that management decided that his performance as lieutenant was inadequate between 2015 and 2018. Around May 2017, the plaintiff was placed on a "Performance Improvement Plan", which included an evaluation of his work performance as lieutenant from May 24, 2017, through February 28, 2018. He entered into a "Last Chance Agreement" in April 2018, where he acknowledged deficiencies in his work performance and agreed to improve these areas during a period of 60 work shifts or risk a demotion. The agreement provided that he failed to meet various guidelines, such as working as a team, leading personnel, communicating effectively, and working calmly in stressful situations.

¶ 12                                C. The Demotion

¶ 13        On January 29, 2019, the plaintiff attended a meeting with Chief Kent Adams, other fire department officials, and the Union Executive Board. During the meeting, Chief Adams informed the plaintiff that he failed to satisfactorily complete the Performance Improvement Plan and terms of the Last Chance Agreement and that his performance as lieutenant remained inadequate. The plaintiff was also informed that he was being demoted from lieutenant to firefighter/paramedic effectively immediately. The plaintiff testified that, while he was listening, "something just snapped" and he "felt like the floor just caved in" on him. He also testified that he was a perfectionist and news of his demotion was the "final push over the cliff of everything that was compounding over the years." The plaintiff credited the demotion as "the straw that broke the camel's back," and he was unable to overcome or adapt to this event. Following the meeting, he drove to an adjacent grocery store parking lot where he read the paperwork and wept. The plaintiff testified that he expressed shock and concern with his family. He stated that it was at that moment

4

he recognized that he needed to talk to someone for professional help.

¶ 14　　On February 1, 2019, the plaintiff contacted the human resources' director to request leave pursuant to the Family and Medical Leave Act (FMLA) "to get some professional help and sort things out." He was then placed on FMLA leave and never returned to work for the fire department.

¶ 15　　　　　　　　　　　　　D. Medical Evidence

¶ 16　　The plaintiff's medical history included orthopedic injuries, migraine headaches, obesity, sleep apnea, bronchitis, hypothyroidism, urinary tract infections, kidney stones, type 2 diabetes, and Non-Hodgkin's lymphoma (in 2008 but he was in remission). The plaintiff suffered an injury to his left knee during a team-building exercise in October 2014, which was fully resolved by June 2015 with surgery and physical therapy.

¶ 17　　In February 2019, the plaintiff was first diagnosed as having suffered a moderate episode of recurrent major depressive disorder by his primary care physician, Dr. Surbhi Shah, one week following his demotion. This was the first mention of any depression symptoms within the plaintiff's medical records. He had undergone multiple depression assessments with Dr. Shah's office from 2012 through 2018 with no depression symptoms noted. His medical records from his cancer treatment also indicated that he denied any signs of depression or anxiety during his medical visits from June 2015 through June 2018.

¶ 18　　The plaintiff then sought psychological treatment and continued therapy sessions through the time of the hearing. He presented to advanced practice registered nurse, Kathleen McGreal, who worked under the direction of a psychiatrist, with anxiety and depression symptoms. The plaintiff noted supervisor changes with his employer caused him stress and anxiety. The plaintiff was taking various medications to address his conditions that were continuously adjusted due to side effects. In March 2019, after two sessions, McGreal completed an FMLA medical certification

where she provided that the plaintiff was unable to perform his job functions due to the severity of his condition as he (1) had anxiety, low motivation, and low energy; (2) was unable to concentrate and focus; and (3) was incompatible with self-reported job functions. She estimated the duration of his condition to be "TBD~4 months."

¶ 19    On April 11, 2019, the plaintiff filed an application for disability benefits with the Board, where he described the nature of his disability as follows:

> "Severe physical and mental conditions including depression, anxiety, sadness, excess worry, poor sleep, anhedonia, inability to concentrate and focus, low motivation, low energy, incompatibility with safe discharge of job functions. Triggered by injuring my head when I fell from the 3rd story training tower during window bailout training in 2006. I have ultimately battled anxiety, posttraumatic stress syndrome, and mental health issues for years. Other aggravating factors for my conditions have included, but are not limited to, the Non-Hodgkin's Lymphoma treatments (2008-2018) and after effects including hypothyroidism and inability to tolerate heat for prolonged periods of time, as well as, after effects of the orthopedic injuries (2015 and 2018) that surface when climbing ladders and standing on pitched roofs. I have tried to cope and bottle everything in, but ultimately, I have recently reached a breaking point and begun seeking necessary medical treatment."

¶ 20    The plaintiff continued treatment with McGreal where his medications were readjusted, and he was diagnosed with insomnia and adjustment disorder with anxiety and depression. The plaintiff reported having dreams at night about falling and continued to suffer from anxiety when driving past the firehouse or viewing anything related to the fire department. McGreal diagnosed the plaintiff with generalized anxiety disorder, moderate episode of a recurrent major depressive

6

disorder, adjustment disorder with anxiety and depression, and PTSD.

¶ 21                    1. Neuropsychological Testing by Dr. Eschbach

¶ 22        The plaintiff's neurologist referred him for neuropsychological testing with Dr. Alexander Eschbach, a clinical neuropsychologist holding a Ph.D., to address his headaches. Dr. Eschbach performed a neuropsychological examination of the plaintiff that commenced on August 31, 2019, and ended on September 3, 2019. The examination consisted of at least 15 different tests designed to measure memory, intelligence, visual perception, verbal learning, speech and language, motor, personality, and emotional functioning.

¶ 23        Dr. Eschbach was most surprised with the plaintiff's poor performance on the Test of Variables of Attention (TOVA), which is a visual processing test. He concluded that the plaintiff's poor performance indicated a neurological deficiency. Dr. Eschbach also noted a decrement in the plaintiff's intelligence as well as deficiencies in visual perception, personality, and emotional functioning. The objective testing showed that the plaintiff suffered from compulsiveness and he was a perfectionist. Dr. Eschbach noted that he suffered from paranoid features and suspiciousness, depression, anxiety, stress, low self-esteem, and worry. Dr. Eschbach reviewed three of the plaintiff's MRI reports and held the impression that the plaintiff suffered from gliosis, which is present following an injury to neuronal tissue in the brain.

¶ 24        Dr. Eschbach's report identified that the plaintiff suffered from a variety of diagnoses. Following the plaintiff's self-report of the fall, Dr. Eschbach concluded that he suffered cognitive changes stemming from the fall and a mild traumatic brain injury (mTBI) with loss of consciousness of unspecified duration. He opined that the fall caused a neural diffuse injury throughout the brain. Dr. Eschbach further opined that persons with mTBI are able to function normally and appear fine to others, but suffer from subtle personality changes that have a big

7

impact on one's ability to work or function. Dr. Eschbach also noted that the plaintiff suffered from obstructive sleep apnea, central sleep apnea, PTSD prolonged, and nicotine dependence. Dr. Eschbach gave primacy to the PTSD diagnosis, stating it was an overriding concern leading to the plaintiff's anxiety and depression. He opined that the plaintiff was disabled due to his neuropsychological status based on information provided by the plaintiff about the fall and his history, which included (1) he fell 30 feet to the ground during a firefighting drill,[1] (2) he hit the back of his helmet after it struck a metal pole on the way down, (3) he could no longer tolerate roller coasters or heights, and (4) he suffered from nightmares and had difficulty sleeping.

¶ 25     During his testimony, Dr. Eschbach was asked about whether the demotion would have any impact on the plaintiff's psychological health. He stated, "I don't even know if he told me that there was like a demotion." However, he stated that such news could still be a psychosocial factor adversely affecting his cognitive and neurological functions. Dr. Eschbach concluded that, due to cognitive changes, the mTBI, and PTSD, the plaintiff was unable to return to work. As to causation, Dr. Eschbach stated that the fall may have caused the plaintiff's disability. However, he equivocated on this point and made it clear that he did not wish to go on the record that there was "definite causality" because he did not know what the plaintiff had been through, but he noted a diminishment in the plaintiff's functioning over the years.

¶ 26                              2. Independent Medical Examinations

¶ 27     The plaintiff underwent three independent medical examinations (IMEs) by Dr. Daniel Samo, Dr. Gaurava Agarwal, and Dr. Carl Wahlstrom, Jr. Each physician was provided the plaintiff's medical records from: the fall, his primary care physician, cancer treatment, Dr.

---

[1]During his testimony, Dr. Eschbach was asked about whether the falling distance of 30 feet (the distance the plaintiff reported to him) versus 15 feet (the distance reported in other records) changed his opinion. In sum, he stated his opinion was unchanged as a fall of 15 feet could still result in an mTBI.

Eschbach's testing, his left knee injury, and therapy sessions. They were also provided with the plaintiff's entry level physical and the job description for firefighter/paramedic. The Board directed Dr. Samo to examine the plaintiff as to the physical health component of his claim and Drs. Agarwal and Wahlstrom to examine the mental health component of his claim. *Supra* ¶ 19.[2]

¶ 28                                          i. Dr. Samo

¶ 29          On October 23, 2019, Dr. Samo of Northwestern Medicine, examined the plaintiff. The plaintiff noted the following during his interview with Dr. Samo: (1) he physically recovered from the fall after about 2-3 days but noticed difficulty finding words since then; (2) he suffered from nightmares since the fall, which decreased in frequency until the demotion when they became frequent; (3) he fully recovered from his bout with Non-Hodgkin's Lymphoma but has lasting thyroid, altered taste, and heat intolerance problems from the chemotherapy and radiation; (4) he no longer suffered from ongoing pain in his back, buttocks, left knee, or right ankle, and he was not undergoing any treatment for previous injuries or his cancer; and (5) his disability was due to his psychiatric issues and his physical injuries were not the cause of the application for benefits.

¶ 30          Dr. Samo performed a physical examination and noted that the plaintiff's physical injuries resolved and his Non-Hodgkin's Lymphoma was in remission. He opined that the plaintiff was not disabled due to his prior physical diagnoses and stated that he was only giving an opinion as to the plaintiff's physical condition as he did not evaluate him for a claim of mental disability.

¶ 31                                          ii. Dr. Agarwal

¶ 32          On October 28, 2019, the plaintiff was examined by Dr. Agarwal, a psychiatrist from Northwestern University Feinberg School of Medicine. Dr. Agarwal compiled a detailed history

---

[2]The Board's decision provides that, at the time of the hearing, the plaintiff only proceeded on his disability claims on the basis that he suffered from PTSD and major depressive disorder.

9

of the plaintiff's background and noted several statements by the plaintiff concerning his mental and physical condition, which included: (1) following his demotion he "felt the floor caved in and my brain was going crazy. I couldn't make sense of it. I couldn't sleep."; (2) he suffered from anxiety symptoms, including his heart racing, queasiness, and butterflies in his stomach, but at the time of this examination, his anxiety was a 0/10 unless he heard or saw someone that reminded him of the fire department; (3) he had headaches for as long as he could remember, which he believed to be sinus headaches, but his neurologist diagnosed them as migraines, which are controlled with ibuprofen; (4) his most troublesome symptoms were difficulty falling asleep and nightmares (about falling or his demotion) as they had become more frequent and woke him in the middle of the night; (6) he was isolative and did not want to do things or deal with people; and (7) he never sought direct care from a psychiatrist but instead sought care from a psychologist and a nurse practitioner who consulted a psychiatrist, which he felt was "the same thing."

¶ 33      Regarding the plaintiff's employment with the fire department, he reported the fall, explaining that he landed on his buttocks and his helmet was cracked on a metal post. He reported that he did not initially think that he lost consciousness but now thought that maybe he was in and out of consciousness because he cannot remember much about the fall. The plaintiff provided that he started having nightmares and difficulty recalling some words following the fall. He also claimed that he suffered abuse from a new battalion chief, who he believed to be a devious person, who "nitpicked" everything about his work performance. The plaintiff believed that this abuse led him to work harder but also feel poorly about his performance. When he knew this particular battalion chief would be working, he would not want to get out of bed and his whole body would ache. Following a fire call in 2017, where a fire truck became stuck in mud and was burned, the plaintiff felt that it was pinned on him, which led to his fire chief placing him on the Performance

10

Improvement Plan. Following his demotion, he decided he could not go to work because he could not concentrate and was unable to manage medications for patients. The plaintiff stated that he felt embarrassed, lacked trust in people, and he did not want to be around the decisionmakers who demoted him. He also felt that he could not return to work as a regular firefighter following his demotion because he was "almost twice as old as any of the guys on the platoon" and could not go back to that. The plaintiff admitted that, even if his mental health symptoms were not present, he would not go back to working for the fire department. He believed that the fire department unjustly demoted him and "no matter what [he] did and how above and beyond [he] worked, they were going to fire [him]."

¶ 34        Dr. Agarwal's report provided 17 pages of excerpts from the plaintiff's medical and employment records and key findings from his evaluation. Dr. Agarwal opined that the plaintiff had no mental health condition that caused symptoms that were the type or severity that would cause him to be unable to perform his essential job duties as a firefighter and/or paramedic. However, he stated that the plaintiff's current medication regimen would need to be tapered prior to returning to work due to potential side effects of those medications, which could lead to work impairment. Dr. Agarwal opined that the plaintiff was not currently disabled due to his mental health condition and stated that he did not have expertise "to comment on any additional reasons for him being disabled, including neurological or cancer related issues."

¶ 35        Dr. Agarwal stated, by the plaintiff's own, repeated admission, the cause of his mental health issues was related to mistreatment of a supervisor, workplace politics, and an unfair demotion. He opined that the timing of the treatment history and removal from work correlated more closely with the demotion, which supported a proximal cause of his current health issues versus a physical injury that may have occurred due to the fall. Dr. Agarwal thought this was true

when considering the plaintiff's excellent work performance years after the fall, which led to his promotion to lieutenant. He also noted Dr. Eschbach's neuropsychological testing notes where he provided that the plaintiff reported more psychological or emotional symptoms than objectively existed or may have exaggerated the severity of symptoms that existed. Dr. Agarwal opined that the plaintiff suffered from adjustment disorder with mixed anxiety and depressed mood.

¶ 36                                        iii. Dr. Wahlstrom

¶ 37        On November 14, 2019, Dr. Wahlstrom, a board certified psychiatrist, examined the plaintiff. He noted that the plaintiff was able to direct his thoughts well to the matters at hand and his concentration and attention were intact throughout the exam. Dr. Wahlstrom found that the plaintiff's short-term and long-term memory appeared unimpaired, and his intellect appeared "grossly intact in all spheres." The plaintiff scored a 30/30 on a cognitive screening exam. The plaintiff reported that his mood was depressed and it had not improved as he searched for the right medications. After performing various tests, Dr. Wahlstrom indicated that the plaintiff scored in the "severe depression range" as self-reported. The plaintiff stated that he did not like to leave the house and lacked the motivation or will to exercise. He further reported that "he had considered returning to paramedic duties but was concerned that he tires too easily, becomes fatigued and does not feel comfortable calculating medication for patients."

¶ 38        Dr. Wahlstrom took a detailed history of the plaintiff's background, health, and current status. He reported several statements from the plaintiff, which included: (1) he got along well with his co-workers, this feeling lasted until about four or five years following his promotion when an influx of new, younger employees brought a different attitude that he did not prefer; (2) following his promotion, he was subjected to a "loud and pushy" supervisor who started to pick on him, made him uncomfortable, and caused him to suffer from self-doubt; (3) he had not returned

12

to the fire department since his demotion and stated "I caved in like a floor caved in. I became depressed, anxious, had bad dreams, crying. I felt like I lost my identify. I had nightmares," and he believed the experience was traumatic and the stress of his evaluations were public, which resulted in subordinates losing faith in his abilities; and (4) his treatment was going well but he was still trying to find the right medication for his anxiety, depression, and PTSD.

¶ 39    Dr. Wahlstrom diagnosed the plaintiff as having a major depressive disorder, single episode, severe. He opined that the diagnosis represented the development of a mental disorder consisting of severe depressive symptoms of depressed mood, loss of usual interests, decreased energy, weight gain, and problems making decisions and concentrating. Dr. Wahlstrom noted that the plaintiff cooperated with his treatment but poorly responded to it. He noted the plaintiff found his demotion to be emotionally traumatic, as seen in adjustment disorders with depression and anxiety, which evolved into major depressive disorder. Dr. Wahlstrom found that there was no indication that the plaintiff suffered from PTSD either by record review or examination. He noted that it was unlikely that the plaintiff's behavioral and emotional symptoms were attributable to a pre-existing condition because none were found by record review or examination.

¶ 40    Dr. Wahlstrom opined that the plaintiff was "unable to reliably and safely perform his duties as a firefighter/paramedic pursuant to the provided job description" due to the nature and extent of his mental disorder, which had been poorly responsive over an extended period of time despite psychotherapy and medication management. However, he opined that it was not medically possible that the plaintiff's condition was a result of the performance of an act of duty or from the cumulative effects of acts of duty. Last, Dr. Wahlstrom opined that the plaintiff's disability was permanent if he were to continue his role of firefighter/paramedic.

¶ 41                        E. The Plaintiff's Condition at Time of Hearing

13

¶ 42    The plaintiff testified that, following his demotion, he feared having any interaction with members of the fire department because he "did not want to face anybody that had anything to do with fire service at that point." He felt shame about, and still did not fully understand, his demotion. The plaintiff reported that his nightmares became worse following the demotion. He stated that he never sought mental health services prior to the demotion because he "did not realize that any of those problems that I experienced over the years were interconnected with each other, and I did not realize that day might have impacted my performance at work and how I was at home or with friends." He did not realize the severity of his condition until he sought help.

¶ 43    The plaintiff stated that he never reported the nightmares or any psychological conditions to the fire department or in his annual departmental physicals prior to the demotion because he always kept those matters secret. When asked about whether he would still be working for the fire department had he not been demoted, he provided that he "would have hoped to be able to carry on and deal with my problems until—for as long as I could until I retired." In sum, he credited his disability to two separate incidents: the June 2007 fall, which caused him to slowly lose his skills, and the January 2019 demotion, which intensified his dreams, anxiety, and depression. At the time of the hearing, he continued therapy sessions and was prescribed daily medications to assist with his depression, anxiety, sleep, and headaches. The plaintiff testified that he continued to suffer from anxiety and depression and was triggered whenever he heard a fire siren or saw a fire vehicle.

¶ 44    The plaintiff testified that he remained forgetful. He continued to suffer from nightmares and had a fear of heights. At the time of the hearing, the plaintiff stated that, for the past couple of months, he had been employed as a delivery driver for DoorDash for a few hours per week. He stated that he found it therapeutic, and it provided a source of income for his family, which suffered financially since he left his job with the fire department. The plaintiff testified that he was told by

14

his treating physicians that he could not return to work at the fire department unless he was completely off some of his medications, and he should not return to work as a firefighter/paramedic on active duty. The plaintiff believed he could be a danger to fellow firefighters and the public. He reported that his last day on the payroll with the fire department was May 26, 2019.

¶ 45                                    F. The Board's Decision

¶ 46        The Board noted that the plaintiff's application for pension benefits listed several paths to disability, but at the time of hearing, he narrowed the claims to PTSD and major depressive disorder. The Board concluded that the plaintiff did not prove a disability, noting: (1) the minor injuries reported after the fall that he fully recovered from, (2) Dr. Eschbach's opinion linking the fall and his condition was based on incomplete and inaccurate information, (3) the plaintiff succeeded in his career for many years following the fall and was promoted after a competitive test, (4) the plaintiff reported a change in work conditions when the department brought in a new battalion chief who frequently challenged the plaintiff's work performance (evidencing a personal dispute rather than a deficit in brain functioning from a fall seven to eight years prior), and (5) the plaintiff only ever reported the claimed conditions immediately following his demotion.

¶ 47        The Board found that there was no credible evidence to support the finding that plaintiff suffered from PTSD as none of the three IME providers found such. Although Dr. Eschbach supported the PTSD claim, the Board reiterated that he received incomplete and inaccurate information from the plaintiff. The Board noted that the claimed PTSD is related to interpersonal aspects of the job, such as dealing with supervisors who criticized him and demoted him and being faced with being placed on the same level as some of his former subordinates. The Board believed that the plaintiff suffered from anxiety and depression, but did not find that these conditions were tied to an act of duty with the fire department. The Board echoed Dr. Agarwal's opinion of an

15

adjustment disorder and noted that all providers found the demotion to be the significant event. The Board also believed that, by the plaintiff's own admission, he would be embarrassed to return to work, which was the cause of his failure to return. Further, it believed that, prior to the plaintiff's demotion, he mentally prepared to move on to another career, which was a willful decision instead of an inability to return due to a disabling psychiatric condition. Thus, the Board concluded that the plaintiff was not disabled and denied his pension claims.

¶ 48                                 G. The Circuit Court's Decision

¶ 49        On review before the circuit court, the court concluded that the Board's determination was not contrary to the manifest weight of the evidence. The court stated that, had the court been a member of the Board, it likely would have reached a different conclusion and weighed the testimony differently. However, the court recognized that it could not reweigh the evidence and there was sufficient evidence of record to support the Board's decision. The plaintiff appeals.

¶ 50                                        II. ANALYSIS

¶ 51        In administrative review cases, this court is tasked with reviewing the decision of the administrative agency and not the determination of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). The applicable standard of review in such cases depends upon whether the question presented is one of fact, law, or a mixed question of law and fact. *Id.* at 532. When the question presented is whether the evidence of record supports denial of the plaintiff's application for disability pension, it is a question of fact. *Id.* at 534. The findings and conclusions of the Board as to questions of fact shall be held to be *prima facie* true and correct. 735 ILCS 5/3-110 (West 2018). Questions of fact are subject to the manifest weight of the evidence standard of review. *Claxton v. Board of Trustees of City of Alton Firefighters' Pension Fund*, 2023 IL App (5th) 220200, ¶ 17. A decision is against the manifest weight of the evidence where the

16

opposite conclusion is clearly evident or if the findings are unreasonable, arbitrary, and not based on any of the evidence. *Scepurek v. Board of Trustees of Northbrook Firefighters' Pension Fund*, 2014 IL App (1st) 131066, ¶ 17. However, it is the Board's function to judge the credibility of witnesses, assign weight to the evidence, and resolve conflicting medical evidence. *Id.* ¶ 31. Thus, where there is competent evidence in the record supporting the Board's decision, this court must affirm that decision. *Covello v. Village of Schaumburg Firefighters' Pension Fund*, 2018 IL App (1st) 172350, ¶ 48.

¶ 52    The Code provides for a not-in-duty pension and a line-of-duty pension for permanently disabled firefighters. The Code defines "disability" as "[a] condition of physical or mental incapacity to perform any assigned duty or duties in the fire service." 40 ILCS 5/6-112 (West 2018). Here, the Board determined that the plaintiff was not disabled, and therefore, was not entitled to a pension. On appeal, the plaintiff takes issue with the Board's finding of not disabled because it relied on the sole opinion of Dr. Agarwal (IME Psychiatrist, M.D.) instead of the opinions of McGreal (Psychiatric-Mental Health, Advanced Practice Registered Nurse), Dr. Eschbach (Clinical Neuropsychologist, Ph.D.), and Dr. Wahlstrom (IME Psychiatrist, M.D.). We decline to reweigh the evidence, and instead, reiterate that our review is narrow in which we determine whether there is sufficient evidence of record to support the Board's determination.

¶ 53    Section 4-112 of the Code provides for the Board to select three physicians for such claims, and these physicians need not agree as to the existence of any disability or the nature and extent of such disability. 40 ILCS 5/4-112 (West 2018). The Board may also consider other evidence as it deems necessary in reaching its determination. *Id.* Our supreme court has interpreted this section to mean that the opinions of the examining physicians need not be unanimous, and the Board may agree with the minority position. See *Wade v. City of North Chicago Police Pension Board*, 226

17

Ill. 2d 485, 513-14 (2007). Further, the Board may accept the position of a single examiner over the other as long as there is a sound basis in the record. See *id.* at 507.

¶ 54    The Board noted that, by the time of the hearing, the plaintiff reduced his claims to PTSD and major depressive disorder. It found that the record lacked any credible evidence that the petitioner was suffering from PTSD, noting that no physicians found any evidence of such. However, the Board did believe that the plaintiff suffered from anxiety and depression. It credited the opinion of Dr. Agarwal, who opined that the plaintiff suffered from adjustment disorder with anxiety and depression. The Board was more persuaded by Dr. Agarwal's opinion of adjustment disorder rather than Dr. Wahlstrom's opinion of adjustment disorder that evolved into major depressive order, noting the plaintiff admitted that his primary failure to return to work was due to embarrassment of his lower rank and dealing with the consequences of the demotion. The Board also called the plaintiff's credibility into question when it pointed out that he only claimed these conditions (to either his employer or medical providers) immediately following his demotion.

¶ 55    Although Dr. Eschbach (Clinical Neuropsychologist, Ph.D.) found that PTSD was the primary cause of the plaintiff's disability, the Board reasonably doubted his findings because many of them were based on the plaintiff's subjective complaints, and the plaintiff misreported significant details, such as the distance from which he fell, the demotion itself, and the demotion's noteworthy timing in relation to his reported symptomology. Dr. Eschbach's report also indicated that the plaintiff reported more psychological or emotional symptoms than objectively existed or he may have exaggerated the severity of symptoms that existed. Again, these facts reasonably led the Board to question the plaintiff's credibility and Dr. Eschbach's conclusions.

¶ 56    Nonetheless, the plaintiff attempts to discredit Dr. Agarwal's opinion because his report indicated that he did not have expertise "to comment on any additional reasons for him being

18

disabled, including neurological or cancer related issues." The plaintiff argues that this "clarification is critical" because Dr. Agarwal did not assess his neurological disability status in contrast to Dr. Eschbach who evaluated his neurological condition and concluded that he was disabled. We disagree and find this distinction without a difference within the context of the facts of this case. The plaintiff's claimed disability was eventually narrowed down to PTSD and major depressive disorder. Dr. Agarwal, a psychiatrist, was qualified to assess the claimed conditions.

¶ 57     As a final matter, the plaintiff also raises McGreal's opinion (Psychiatric-Mental Health, Advanced Practice Registered Nurse) that he was disabled, which the Board's decision did not reconcile. The plaintiff cites to the March 2019 FMLA form that McGreal completed on his behalf. We find it unsurprising that the Board did not mention McGreal in its reasoning as her opinion was rendered between two and three months after the demotion (compared to the IMEs from around nine months after the demotion), only made in the context of an FMLA certification form, and based on the plaintiff's subjective complaints and self-reported job description. Further, McGreal thought the issue would resolve in "TBD~4 months," she did not testify at the hearing, and the plaintiff points to no updated written opinion from McGreal as to his disability status.

¶ 58     Therefore, we find a sufficient basis in the record to support the Board's determination that the plaintiff was not disabled, and therefore, not entitled to a disability pension.

¶ 59                                    III. CONCLUSION

¶ 60     For these reasons, the judgment of the circuit court of Will County is affirmed.

¶ 61     Affirmed.